STATE OF NORTH CAROLINA v. JAMEY J.C. CHEEK

No. 577A97

(Filed 5 November 1999)

### 1. Constitutional Law— informant—identity—disclosure not required

The trial court did not err in denying defendant's motion to require the State to disclose the identity of an informant who notified the police of the hiding place of a codefendant who defendant contended coerced him to take part in a kidnapping and murder where there was no showing or indication in the record that the informant was interested in exchanging information for reward money, or that the informant was either a participant in or a witness to the kidnapping and murder or was a witness to defendant's alleged coercion by the codefendant.

### 2. Criminal Law— duress—not murder defense—diary lost by State

Duress is not a defense to murder in this state; therefore, defendant was not denied a fair trial on a murder charge because the State lost and could not provide to defendant a diary of a deceased accomplice which purportedly supported defendant's contention that the accomplice was a violent person and that defendant participated in the murder because of coercion and duress by the accomplice.

### 3. Discovery; Criminal Law— duress—diary lost by State— fair trial not denied

Defendant was not denied a fair trial on kidnapping and robbery charges because the State lost and could not provide to defendant pursuant to his discovery request the diary of a deceased accomplice which defendant contended supported his defense that he acted under coercion and duress by the accomplice where the record shows that, during the extended course of the crimes against the victim, defendant had several opportunities to report that he had been forced by duress to commit these crimes and to seek help but failed to do so, and the trial court correctly concluded that the diary contained no evidence tending to show that the accomplice exercised active and immediate coercion over defendant at the time they committed any of the crimes against the victim.

## 4. Confessions and Incriminating Statements— voluntari-ness—lack of sleep and food—consumption of drugs and alcohol

Statements defendant made to the police were not involun-tary and inadmissible because defendant had not slept or eaten during the two days prior to his arrest and had consumed drugs and alcohol during that time where defendant did not present any evidence that indicates that he was impaired or intoxicated at the time he made the statements, and the trial court's findings sup-port the conclusion that defendant's statements were made in the absence of police coercion.

## 5. Evidence— subsequent crime or act—motive, intent, plan and modus operandi

In a prosecution of defendant for the first-degree murder and armed robbery of a taxicab driver, evidence concerning defendant's robbery five days later of a Shoney's restaurant and a second cab driver who took defendant and his accomplice to the restaurant was relevant and admissible to show defend-ant's motive, intent, plan and modus operandi in the robbery of the cab driver in this case where the victims in both cases were taxicab drivers who initially picked up defendant and his accom-plice as customers; both drivers were forced out of their cabs at gunpoint and their cabs were stolen; and the gun used by defend-ant and his accomplice in the robbery and murder of the first driver was the same gun used to rob the restaurant and the second driver.

## 6. Jury— capital sentencing—jury selection—questions—act-ing in concert, aiding and abetting, felony murder—not improper stake-out

The State was not improperly permitted to "stake-out" prospective jurors in this capital case and bias them in favor of a sentencing decision of death by asking those jurors questions regarding their abilities to follow the law on acting in concert, aiding and abetting, and the felony murder rule where the State's questions contained an accurate summary of the law, the State merely asked whether the prospective jurors would be able to follow the law, and nothing in the record suggests that the State was inquiring how a prospective juror would be inclined to vote under a given set of facts.

STATE v. CHEEK

[351 N.C. 48 (1999)]

### 7. Evidence— impeachment—exclusion of testimony

Defendant was not erroneously prevented from impeaching the investigating officer's testimony by the trial court's sustaining of the State's objections to certain questions asked the officer where the evidence defendant desired to elicit was already before the jury, and defendant's questions would not in fact serve to impeach the officer.

### 8. Evidence— expert testimony—capacity to form intent— leading question—other testimony

The trial court did not err in sustaining the State's objection to defense counsel's question "as phrased" to an expert witness in pharmacology concerning whether defendant's drug use and sleep deprivation precluded him from formulating a plan with another individual to kidnap and rob a cab driver because the question was a leading question. Moreover, defendant was not deprived of the opportunity to present evidence relevant to the issue of defendant's capacity to form the specific intent to commit the crimes charged where the record shows that the witness thereafter had the opportunity to, and did in fact, give his opinion as to defendant's ability to make and carry out plans.

### 9. Evidence— hearsay—corroboration—exclusion not prejudicial

Defendant was not prejudiced by the trial court's exclusion of an officer's hearsay testimony about a codefendant's statements to a confidential informant concerning the robbery of a restaurant where defendant contended that the statements would corroborate his assertion that the codefendant committed the robbery alone, but testimony by the officer on voir dire showed that the codefendant indicated that he did not act alone in committing the robbery.

### 10. Criminal Law— duress—gun ownership by codefendant— stipulation—violence by codefendant—irrelevancy

The trial court did not err by excluding evidence that the codefendant owned a gun, offered by defendant to show that defendant acted under duress by the codefendant in a kidnapping and robbery, where it was stipulated that the bullet fired into the victim's head came from the codefendant's gun and that the gun was recovered beside the codefendant's body. Furthermore, evidence of the codefendant's acts of violence toward a third party and a letter from the codefendant stating his preference for sui-

cide over prison was not relevant to defendant's defense of duress since evidence that the codefendant was a violent person was not sufficient to show that the codefendant exercised active and immediate coercion over defendant at the times they committed the crimes.

**11. Criminal Law— mere presence—instruction not warranted**

Defendant was not entitled to an instruction on "mere presence" with regard to charges of first-degree kidnapping and armed robbery where the evidence showed that defendant actively participated in those crimes.

**12. Homicide— first-degree murder—voluntary intoxication— instruction not warranted**

The trial court did not err by refusing to give defendant's requested instruction on "drugged condition," or voluntary intoxication, with regard to a first-degree murder charge in that defendant failed to present sufficient evidence from which a jury could conclude that defendant was so intoxicated that he was "utterly incapable" of forming the specific intent to commit first-degree murder where the evidence was conflicting as to whether defendant took any drugs on the day of the murder, but the evidence showed that defendant had the ability to drive the victim's cab for a distance of over fifty miles after the victim was kidnapped, and defendant had the capacity to discuss with police, in detail, the events which occurred both before and after defendant arrived in the city in which the victim was killed.

**13. Sentencing— capital sentencing—aggravating circumstances—course of robbery and kidnapping**

The trial court did not err in submitting two separate (e)(5) aggravating circumstances, that the murder was committed during the course of a robbery and that it was committed during the course of a kidnapping, where the State presented distinct evidence that defendant committed each of those crimes during the course of the murder. N.C.G.S. § 15A-2000(e)(5).

**14. Sentencing— capital sentencing—aggravating circumstances—heinous, atrocious, or cruel**

Medical evidence supported the trial court's submission of the (e)(9) aggravating circumstance that the murder of a cab drive was especially heinous, atrocious, or cruel where the cause of death was carbon monoxide poisoning from a fire, and the evi-

dence was sufficient for the jury to find that the victim was alive when her taxicab was set on fire and was aware of her impending death. N.C.G.S. § 15A-2000(e)(9).

**15. Sentencing— capital sentencing—mitigating circumstances—subsumption by other mitigating circumstances**

The trial court did not err by refusing to submit defendant's requested nonstatutory mitigating circumstance in a capital sentencing proceeding that a codefendant initiated the plan that led to the kidnapping of the murder victim where the court correctly ruled that this circumstance was subsumed by the (f)(4) minor participation and (f)(5) duress mitigating circumstances submitted to the jury. N.C.G.S. § 15A-2000(f)(4) and (f)(5).

**16. Sentencing— capital sentencing—mitigating circumstances—peremptory instruction—conflicting evidence**

The trial court did not err by refusing to peremptorily instruct the jury on the (f)(2) mitigating circumstance that defendant was under the influence of a mental or emotional disturbance and the (f)(6) impaired capacity mitigating circumstance where testimony by defendant's psychiatric expert supporting those circumstances based on his interview of defendant was contradicted by a statement defendant made to a law officer and by defendant's testimony at trial. N.C.G.S. § 15A-2000(f)(2).

**17. Sentencing— capital sentencing—mitigating circumstances—peremptory instruction—conflicting evidence**

The trial court did not err in refusing to give a peremptory instruction on the (f)(5) mitigating circumstance that defendant acted under duress or under the domination of another person where defendant's evidence that he acted only out of fear of a codefendant was undermined by evidence showing defendant's efforts to reunite with the codefendant once they were separated after the murder. N.C.G.S. § 15A-2000(f)(5).

**18. Sentencing— capital sentencing—Issue Three—unanimity—inquiry by jury—instruction**

The trial court did not err in instructing the jury in a capital sentencing proceeding that it must either unanimously answer "yes" or "no" to the question presented in Issue Three of the Issues and Recommendation as to Punishment form. Furthermore, when the jury asked during deliberations whether it could

strike the word "unanimous" from Issue Three but did not inquire into the result of its failure to reach a unanimous verdict, the trial court did not err by again instructing the jury that Issue Three required a unanimous answer without also instructing the jurors that their inability to reach a unanimous verdict should not be their concern but should simply be reported to the court.

## 19. Sentencing— capital sentencing—refusal to declare hung jury—failure to give statutory instruction

The trial court did not err by refusing to declare the jury deadlocked or "hung" on a sentencing recommendation in a capital sentencing proceeding after the jury had deliberated nine hours without reaching a decision on Issue Three where the jury never deliberated longer than two hours and thirty-seven minutes without a break; the jury did not indicate that it was deadlocked or was not making progress in its deliberations; and the State and defendant had presented a substantial quantity of evidence in a lengthy trial. Nor did the trial court commit plain error by failing to instruct the jury on the failure to reach a verdict or on each juror's individual responsibility as set out in N.C.G.S. § 15A-1235.

## 20. Sentencing— capital sentencing—death penalty— proportionality

A sentence of death imposed upon defendant for first-degree murder of a taxicab driver was not excessive or disproportionate where the jury convicted defendant under the theories of premeditation and deliberation and felony murder; the jury found as aggravating circumstances that (1) the murder was committed while defendant was engaged in the commission of a robbery, (2) the murder was committed while defendant was engaged in the commission of a kidnapping, and (3) the murder was especially heinous, atrocious, or cruel; defendant was also convicted of armed robbery and first-degree kidnapping; and defendant exhibited no remorse after the killing.

Justice FREEMAN did not participate in the consideration or decision of this case.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Strickland, J., on 3 July 1997 in Superior Court, New Hanover County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments

was allowed by the Supreme Court on 15 September 1998. Heard in the Supreme Court 14 April 1999.

*Michael F. Easley, Attorney General, by John G. Barnwell, Assistant Attorney General, for the State.*

*Margaret Creasy Ciardella for defendant-appellant.*

LAKE, Justice.

On 15 July 1996, defendant was indicted for first-degree murder; on 12 August 1996, he was indicted for robbery with a dangerous weapon; and on 19 May 1997, he was indicted for first-degree kidnapping. Defendant was tried capitally to a jury at the 9 June 1997 Criminal Session of Superior Court, New Hanover County. The jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. The jury also found defendant guilty of robbery with a dangerous weapon and first-degree kidnapping. Following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction. On 3 July 1997, the trial court sentenced defendant to death. The trial court also sentenced defendant to a consecutive sentence of sixty-four to eighty-six months' imprisonment for the robbery conviction and to a consecutive sentence of seventy-three to ninety-seven months' imprisonment for the kidnapping conviction. Defendant appealed his conviction for first-degree murder and his sentence of death to this Court as of right. On 15 September 1998, this Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of the remaining convictions.

At trial, the State's evidence tended to show that on 21 June 1996, at approximately 12:25 p.m., defendant and Tom Nelson entered the taxicab of Ms. Barbara Oxendine at the Piney Green Shopping Center in Jacksonville, North Carolina. She drove defendant and Nelson to a bar in Jacksonville. Upon arriving at the rear of the bar, Nelson pointed a gun at Ms. Oxendine and ordered her to get out of the car. Nelson struck Ms. Oxendine in the head, and defendant and Nelson bound her with flex ties. Defendant put Ms. Oxendine either in the backseat or in the trunk of the cab. Defendant and Nelson then drove the cab to Wilmington, North Carolina.

Upon arriving in Wilmington, defendant and Nelson stopped at a grocery store where Nelson purchased beer, paper towels and lighter fluid. Defendant remained in the cab outside of the store while

STATE v. CHEEK

[351 N.C. 48 (1999)]

Nelson went inside. After leaving the grocery store, Nelson told defendant they were going to shoot Ms. Oxendine and burn her in the car.

At approximately 2:00 p.m., Ms. Oxendine's cab was seen in Wilmington, in the area of the Sophie West Florist Shop on Market Street, near New Centre Drive and Sigmon Road. A waitress at Hooters restaurant in Wilmington, Rachael Frisbie, testified that she took an order from defendant and Nelson that same day. Ms. Frisbie testified that the two men asked her for directions to the hospital and asked her to call a cab for them. Their restaurant receipt, which was time-stamped at 2:23 p.m., showed that their order was "a pint of beer and a Coke." Ms. Frisbie also testified that the restaurant's clock was kept five minutes fast.

Cabdriver Billy Shirer testified that at 2:26 p.m. on 21 June 1996, he picked up two men at Hooters restaurant and drove them to New Hanover Hospital. While defendant and Nelson were riding to the hospital in Shirer's cab, firefighters were en route to a burning taxicab just off of Sigmon Road; the fire was first reported at 2:28 p.m. The burning cab was near Hooters restaurant located on the corner of Market Street and New Centre Drive diagonally across Market Street from the Sophie West Florist Shop.

Firefighters responding to the fire had difficulty extinguishing the fire. Once the fire was extinguished, a fireman discovered a body in the trunk of the cab; the body was later identified as Ms. Oxendine's. Charcoal-lighter cans were found in the driver's seat and on the ground beside the front passenger door, along with a beer bottle which still had condensation on it. An SBI expert in the cause and origin of fires testified that, in all probability, a flammable liquid had been poured across the front floorboard and between Ms. Oxendine's legs in the trunk.

An autopsy performed on 22 June 1996 on Ms. Oxendine revealed extensive burns to the skin of the abdomen, legs and arms as well as to the face and head. Charring obscured a gunshot wound to her head. Soot was present in the victim's nose, mouth, trachea and lungs. This indicated that notwithstanding the bullet wound to her head, Ms. Oxendine was alive when the fire started. The level of carbon monoxide in the victim's blood gases also indicated that Ms. Oxendine was alive when the fire began. The cause of Ms. Oxendine's death was determined to be carbon monoxide poisoning.

STATE v. CHEEK

[351 N.C. 48 (1999)]

Shortly before 9:30 p.m. on Wednesday, 26 June 1996, Nelson and defendant hailed a cab and directed the driver, Tom Newton, to go to a Shoney's restaurant in Jacksonville. When the cab arrived at Shoney's, defendant remained in the cab and initiated a conversation with the driver concerning the Wilmington shooting and inquired whether the police had any suspects. Meanwhile, Nelson had entered the restaurant and robbed the cashier at gunpoint. Nelson came out of Shoney's, got back into the cab and forced the driver out at gunpoint. After the driver got out of the cab, defendant got into the driver's seat and drove away. The cabdriver and restaurant employees flagged down the police, and the police then immediately pursued the stolen cab. The cabdriver witnessed Nelson firing shots at the police. The cab was then stopped by traffic, and defendant and Nelson fled the cab. The police proceeded to chase defendant and Nelson on foot, and at this point, another shot was fired at police. After this final shot, defendant and Nelson succeeded in escaping from the police.

At trial, Shawn Kronstedt testified that he spent the night of 26 June 1996 in the same trailer as defendant. Kronstedt testified that defendant discussed the Shoney's robbery and bragged about eluding the police. Defendant also referred to Nelson as defendant's partner. On the morning of 27 June 1996, Kronstedt's employer, Patrick Pappenfuse, arrived to deliver Kronstedt's paycheck. Defendant introduced himself to Pappenfuse and began telling him about the Shoney's robbery and the shootout with police. Defendant bragged that the police were afraid of him. Defendant told Pappenfuse that he had a partner and that they were going to meet later in the day at the Yellow Rose Saloon. Pappenfuse left the trailer and called Sheriff Edward Brown of the Onslow County Sheriff's Department. The sheriff and Pappenfuse subsequently met, and Pappenfuse relayed the information to the sheriff.

On 28 June 1996, law enforcement officers went to the Yellow Rose Saloon to search for Nelson and defendant, and thereafter searched the trailer where Pappenfuse had spoken with defendant. The police found a cutout of a newspaper article about the Shoney's robbery. The officers then met behind the Yellow Rose Saloon to wait for a tracking dog to search a wooded area. While waiting, Sheriff Brown heard a shot fired and saw two men run from a trailer behind the saloon. After an exchange of gunfire, officers found the body of Nelson lying in the roadway. He had committed suicide. Defendant escaped into the wooded area but surrendered to officers twelve hours later.

STATE v. CHEEK

[351 N.C. 48 (1999)]

**[1]** In his first assignment of error, defendant contends that the trial court committed reversible error in denying defendant's motion to disclose the identity of the informant who notified the police as to where his codefendant, Tom Nelson, was hiding. Defendant also argues in this assignment of error that the trial court erred in failing to compel the State to provide a copy of the "diary" kept by Nelson. Finally, once it was apparent that the diary was lost, defendant contends that the trial court erred in refusing to sanction the State for its failure to preserve and disclose exculpatory evidence pursuant to N.C.G.S. § 15A-910.

In this case, defendant based his defense to the murder and kidnapping charges on the theory that he was an unwilling participant who accompanied Nelson as a result of his fear of Nelson. Defendant learned during discovery that a confidential informant telephoned the Onslow County police and asked whether there was a reward for information about the robbery of Shoney's restaurant. The informant then indicated that Nelson committed the robbery and that he acted alone. Defendant contends that the informant's testimony was material to defendant's trial since defendant claims that he would not have been involved in the kidnapping and murder of Ms. Oxendine if he had not been subject to duress by Nelson.

The United States Supreme Court has held that in determining whether a defendant has a right to disclosure of an informant's identity, a court must consider the particular circumstances of each case such as "the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Roviaro v. United States*, 353 U.S. 53, 62, 1 L. Ed. 2d 639, 646 (1957). This Court has examined the holding in *Roviaro*, and has stated:

> "[B]efore the courts should even begin the balancing of competing interests which *Roviaro* envisions, a defendant who requests that the identity of a confidential informant be revealed must make a sufficient showing that the particular circumstances of his case mandate such disclosure."

*State v. Williams*, 319 N.C. 73, 83-84, 352 S.E.2d 428, 435 (1987) (quoting *State v. Watson*, 303 N.C. 533, 537, 279 S.E.2d 580, 582 (1981)). Additionally, this Court has ruled that the disclosure of an informant's identity "is required where the informer directly participates in the alleged crime so as to make him a material witness on the issue of guilt or innocence." *State v. Ketchie*, 286 N.C. 387, 390, 211 S.E.2d 207, 209 (1975).

There is no showing or indication from all the evidence of record that the informant in this case was interested in anything other than exchanging information for money, or that the informant was either a participant in or a witness to the kidnapping and murder of Ms. Oxendine or was a witness to defendant's alleged duress by Nelson. Because there is no showing or indication from the evidence that the informant was involved in any of the alleged crimes, and because defendant has failed to show how the informant could serve as a material witness as to defendant's guilt or innocence, the trial court correctly denied defendant's motion to reveal the informant's identity.

Defendant also contends that the trial court erred in denying his discovery motion in which he requested that the State turn over a diary maintained by Nelson that was in the possession of Jacksonville law enforcement officers. On 9 June 1997, the trial court conducted an evidentiary hearing on the contents and relevancy of Nelson's diary. Amanda Beck, Nelson's girlfriend, testified during this hearing that law enforcement officers had approached her and asked if she had evidence regarding Nelson. She gave Nelson's diary to a deputy from the Onslow County Sheriff's Department. At some time after that, Ms. Beck telephoned the sheriff's office to inquire about the diary. She testified that she could not remember when she called or to whom she talked, but that she was told "that it was lost; that they couldn't find it."

When asked if she had read any of the contents of Nelson's diary, Ms. Beck stated:

He wrote about a robbery at a convenience store. There was a police officer in the convenience store and a couple of their people. He got mad because the police officer was there, and he hates police officers, and it went on to say that he bashed [the officer] in the head with a claw hammer.

Then, during cross-examination, Ms. Beck testified:

That's what I really remember, you know, pretty much. After I read the story about the police officer and how he felt toward police officers, I kind of felt sick, like he could actually be that crazy to do things like that, even in his head, so I didn't read any more.

Counsel for defendant then began direct examination of Onslow County Sheriff Brown. Defendant's counsel questioned how the sher-

iff's department obtained the diary, and the following colloquy ensued:

Q. Do you recall a conversation with [Ms. Beck] about [Nelson's] diary, among other things?

A. She called me, called the office, on July 1, 1996, to tell me she had found a diary that belonged to Tom Nelson and that there was some bad things in it and maybe I needed to look at it.

Q. What, if anything, did you do, as a result of that conversation?

A. I sent a Deputy Thomas Gagnon out to her place at Yellow Rose Saloon to pick up the diary.

Q. Did he give her a receipt for it, as far as you're aware?

A. I don't know. He brought it back to me. I don't know whether there was a receipt given to her or not.

Q. Did you establish a chain of custody on the item?

A. From him to myself. From her to him, I don't have any chain of custody.

Q. Okay. What did you do after looking at—let me rephrase that. Did you have occasion to read the diary?

A. I looked through the diary to see if there was anything that would have been relative to law enforcement. I was not going to plunder in his life, even after his death, but I was interested in anything that might clear up any crimes that he may have committed.

As to Nelson's entry describing hitting a police officer in the head with a hammer, Sheriff Brown testified:

If my memory serves me correct, he mentioned killing one [police officer], knocking him in the head with a hammer and the hammer sticking in the skull, and he couldn't get the skull out, I mean get the hammer out of the skull, and some other activity that went on there. The best I can remember, he related about stealing a new car.

Sheriff Brown explained how he used Nelson's journal entry in his search for information regarding unsolved crimes:

A. . . . I said to myself, I'll check it out. I don't remember what state it was at, or whether it even mentioned a state, but I believe

I did call where he was from, or where he was in prison at, to see if they had any such crime as that committed done, and was told if they would have had something like that they would have remembered it.

Q.  Where was he in prison at?

A.  I want to say Virginia or somewhere upstate. I don't remember, exactly, but I do remember calling, and I was told if they would have had a crime committed that bizarre, they would have remembered it.

Q.  But it wouldn't necessarily have been in the state he had been in prison, would it?

A.  Well, when you—it would have been in the state he had been in prison in, or you run a PIN message asking for any type murder fitting that description and did not get a reply.

Q.  What did you run a PIN message on?

A.  The murder, describing the murder of an officer or a deputy or reserve offer [sic] getting hit in the head with a hammer and the hammer being stuck in the head because he said he couldn't pull it out.

Q.  You only ran that—did you run that throughout all the states?

A.  Best I remember, I ran it on the PIN machine to see if we could get anybody anywhere. I never did get a reply back on that.

Finally, Sheriff Brown testified that he did not return the diary to the other evidence because there appeared to be nothing in the diary "relative to law enforcement." When asked why the diary had not been returned to Ms. Beck, Sheriff Brown explained:

I thought it had been given back to Miss Beck. Matter of fact, I have turned my office drawers and everything upside-down trying to find it. I thought it had been given back to her.

The trial court then proceeded to enter findings of fact and a conclusion of law. Among these findings, the court stated "that from the testimony of both Sheriff Brown and Amanda Beck at this hearing, there is nothing contained in the diary that would be of benefit to the defendant in this case in the nature of exculpation." The trial court then concluded:

[T]he diary is of no exculpatory effect insofar as this defendant is concerned. Based upon the foregoing findings of fact and conclusion of law, it is the order of this Court that the failure to locate said diary is not fatal and that the defendant's motion to dismiss the charges against the defendant be and the same is hereby denied.

Defendant then requested the trial court to include the finding that Sheriff Brown "admitted that the sheriff's department lost the diary." The trial court denied this request.

The United States Supreme Court has held that suppression by the State of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt/innocence or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218 (1963). In determining whether evidence is material, the Supreme Court stated:

The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494 (1985). Defendant contends that the Nelson diary was material to defendant's defense because it supported defendant's contention that Nelson was a violent person, which in turn supported defendant's defense that he accompanied Nelson only out of fear. Therefore, defendant asserts that the trial court erroneously concluded that the diary did not contain any exculpatory evidence, and because he was denied access to such evidence, defendant contends his trial was fundamentally unfair.

[2] This contention as it relates to the charge of first-degree murder is inapplicable since duress is not a defense to murder in North Carolina. *State v. Gay*, 334 N.C. 467, 490, 434 S.E.2d 840, 853 (1993). Since defendant may not use duress as a defense to the charge of first-degree murder, the trial court correctly concluded that the diary did not contain any exculpatory evidence which could aid defendant, and it correctly denied the motion to dismiss as to the murder charge. However, the affirmative defense of duress, if proven, would serve as a complete defense to the kidnapping and robbery charges. *See State v. Brock*, 305 N.C. 532, 290 S.E.2d 566 (1982). In order to successfully

STATE v. CHEEK

[351 N.C. 48 (1999)]

invoke the duress defense, a defendant would have to show that his "actions were caused by a reasonable fear that he would suffer immediate death or serious bodily injury if he did not so act." *State v. Strickland*, 307 N.C. 274, 299, 298 S.E.2d 645, 661 (1983), *overruled on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986).

**[3]** In the case *sub judice*, the record contains no evidence which indicates that defendant participated in the kidnapping and robbery of Oxendine as a result of coercion. During the extended course of the crimes against Oxendine, defendant had several opportunities to report that he had been forced by duress to commit these crimes and to seek help. The record shows that defendant went to New Hanover Hospital after the murder, where he could have sought help, but he failed to do so. There is also evidence that after the 26 June 1996 robbery of Shoney's restaurant, defendant and Nelson separated as they fled the police. Rather than seeking help at that point, defendant voluntarily sought out Nelson's company again. The trial court correctly concluded that the diary contained no evidence tending to show that Nelson exercised active and immediate coercion over defendant at the time they committed any of the crimes against Oxendine. This assignment of error is overruled.

In his next assignment of error, defendant contends that the trial court committed reversible error by denying defendant's motion to suppress and then subsequently admitting into evidence statements that defendant made to the police. Defendant contends that his statements should have been suppressed on the grounds that he had invoked his right to counsel, that the statements were coerced, and that the statements were otherwise made in violation of defendant's constitutional and statutory rights.

Defendant also argues that his statements were not voluntary because at the time of his interrogation, defendant had been awake for almost two days. During this two-day period, defendant had consumed vast quantities of drugs and alcohol and no food, and he had spent ten hours in the woods hiding from the police. Defendant filed his motion to suppress on 4 November 1996, and an evidentiary hearing on defendant's motion was held on 5-7 May 1997. After making findings of fact and conclusions of law, the trial court denied defendant's motion to suppress.

Defendant's assignment of error to this Court challenging the trial court's order provides:

18. The court's denial of defendant's motion to suppress statements defendant allegedly made to the police; on the grounds the court's findings of fact were contrary to the evidence, its conclusion of law was erroneous and its ruling was otherwise in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article I, Sections 18, 19, 23, 24, and 27 of the North Carolina Constitution, and was in violation of North Carolina statutory and common law.

In this assignment of error, defendant has failed to specifically except to any of the trial court's findings of fact relating to this motion. Defendant has additionally failed to identify in his brief which of the trial court's thirty-one findings of fact are not supported by the evidence. Therefore, this Court's review of this assignment of error is limited to whether the trial court's findings of fact support its conclusions of law. *State v. Watkins*, 337 N.C. 437, 438, 446 S.E.2d 67, 68 (1994).

We have carefully reviewed each of the trial court's findings, including its findings relating to defendant's arrest, custody and the circumstances thereof; defendant's *Miranda* rights being given; defendant's acknowledgment that he understood these rights; the findings of fact with respect to the robbery of Shoney's restaurant as related by defendant; and those regarding defendant's request for a lawyer. On this basis, we conclude that the trial court's findings of fact fully support its conclusions of law that defendant's statements were freely, voluntarily and understandingly made and that none of defendant's federal or state constitutional rights were violated by his arrest, detention, interrogation or statements.

**[4]** With regard to defendant's assertion that his statements were not voluntary because he had not slept or eaten during the two days prior to his arrest and that he had consumed drugs and alcohol during that time, we note that the United States Supreme Court has declined to create a constitutional requirement that defendants must confess their crimes "only when totally rational and properly motivated," in the absence of any official coercion by the State. *Colorado v. Connelly*, 479 U.S. 157, 166, 93 L. Ed. 2d 473, 484 (1986). Additionally, this Court has consistently held "that 'police coercion is a necessary predicate to a determination that a waiver or statement was not given voluntarily,' and without police coercion, the question of voluntariness does not arise within the meaning of the Due Process Clause of the Fourteenth Amendment." *State v. Morganherring*, 350 N.C. 701,

722, 517 S.E.2d 622, 635 (1999) (quoting *State v. McKoy*, 323 N.C. 1, 21-22, 372 S.E.2d 12, 23 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990)).

Defendant has not presented any evidence that demonstrates or indicates that he was impaired or intoxicated at the time he made the statements. Additionally, the trial court's findings of fact support the conclusion that defendant's statements were made in the absence of police coercion. This assignment of error is overruled.

[5] In his next assignment of error, defendant contends that the trial court committed reversible error by denying defendant's motion to exclude all evidence concerning the Shoney's robbery that occurred five days after the victim was killed in this case. Prior to trial, defendant filed a motion *in limine* to prohibit the State from introducing evidence regarding the subsequent robbery of Shoney's restaurant. The trial court heard arguments on that motion and subsequently denied it.

Rule 404(b) of North Carolina's Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident. Admissible evidence may include evidence of an offense committed by a juvenile if it would have been a Class A, B1, B2, C, D, or E felony if committed by an adult.

N.C.G.S. § 8C-1, Rule 404(b) (1998). This Court has ruled that the list of purposes for which evidence of other crimes is admissible is "neither exclusive nor exhaustive." *State v. Moseley*, 338 N.C. 1, 32, 449 S.E.2d 412, 431 (1994), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995). Additionally, this Court has held that evidence of other crimes "is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime." *State v. White*, 340 N.C. 264, 284, 457 S.E.2d 841, 852-53, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995).

In this case, the circumstances surrounding the subsequent robbery of Shoney's restaurant and Newton indicate that defendant and Nelson used the same method of operation as in the robbery of Ms. Oxendine. In both cases, the victims were taxicab drivers who ini-

tially picked up defendant and Nelson as customers. Also, in both incidents, the cabdrivers were then taken by surprise and forced out of their cabs at gunpoint, and then both vehicles were stolen. The gun that defendant and Nelson used in their robbery and murder of Oxendine was the same gun that they used to rob the restaurant and Newton. Accordingly, the evidence surrounding the robbery of Shoney's restaurant and Newton, as well as the circumstances immediately preceding and following those robberies, was relevant to show defendant's motive, intent, plan and *modus operandi* in the robbery of Ms. Oxendine. Because this evidence is relevant to facts other than defendant's propensity to commit the crime, this assignment of error is overruled.

[6] In his next assignment of error, defendant contends that the trial court committed reversible error in allowing the State to question prospective jurors regarding their willingness to convict defendant and to sentence him to death under a given set of facts. Defendant argues that the jury-selection process in this case failed to meet the constitutional requirements of fairness because the State was allowed to improperly "stake out" the jurors and bias them in favor of a sentencing decision of death.

During *voir dire*, the State explained the general legal concepts of first-degree murder to prospective jurors, and then the prosecutor asked:

> I know I'm throwing a lot of terms at you, but do you feel like that you could follow the law as His Honor gives it to you and—if you were convinced, beyond a reasonable doubt, of the defendant's guilt, even though he didn't actually pull the trigger or strike the match or strike the blow in the murder, but that he was guilty of aiding and abetting and shared the intent that the victim be killed—that you could return a verdict of guilty on that?

Further into jury selection, the following exchange occurred:

> [PROSECUTOR]: Do you understand that? Mr. Newman, would that cause you any problem, the fact that one person may not have actually struck the blow or pulled the trigger or lit the match, but yet he could be guilty under the felony murder rule if he was jointly acting together with someone else in the kidnapping or committing an armed robbery?
>
> JUROR NUMBER TWO: Yeah, I can see how it would be so.

[PROSECUTOR]: Can you follow the law as His Honor gives it to you on that issue?

JUROR NUMBER TWO: Uh-huh.

[PROSECUTOR]: Am I making myself clear on that? So you feel like that you could follow the law as His Honor gives it to you under the felony murder rule and find someone guilty of first-degree murder, if you were convinced, beyond a reasonable doubt, that they had engaged in the underlying felony of either kidnapping or armed robbery, and find them guilty, even though they didn't actually strike the blow or pull the trigger or light the match, or whatever the cause of death may have been, that someone else may have actually done that?

At the time the State asked these questions, juror number five and juror number six were on the panel. The State repeated these questions throughout *voir dire* and asked very similar questions to other panels from which jurors were chosen. Defendant argues that these questions were improper because, at trial, the State presented evidence and argued that codefendant Nelson struck the victim in the head, that Nelson pulled the trigger and shot the victim, and that Nelson lit the match that set the cab on fire while the victim was in the trunk.

"In reviewing any *voir dire* questions, this Court examines the entire record of the *voir dire*, rather than isolated questions." *State v. Jones*, 347 N.C. 193, 203, 491 S.E.2d 641, 647 (1997). The trial court has a great deal of discretion in monitoring the propriety of questions asked by counsel during *voir dire*, and the standard of review on this issue is whether the trial court abused its discretion and whether that abuse resulted in harmful prejudice to the defendant. *Id.*

With regard to defendant's contention that the State was allowed to ask impermissible questions during *voir dire*, this Court has consistently upheld the following rule:

"Counsel may not pose hypothetical questions designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts. In the first place, such questions are confusing to the average juror who at that stage of the trial has heard no evidence and has not been instructed on the applicable law. More importantly, such questions tend to 'stake out' the juror and cause him to pledge himself to a future course of action. This the law neither contemplates

**STATE v. CHEEK**

[351 N.C. 48 (1999)]

nor permits. The court should not permit counsel to question prospective jurors as to the kind of verdict they would render, or how they would be inclined to vote, under a given state of facts."

*Id.* at 202, 491 S.E.2d at 647 (quoting *State v. Vinson*, 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *death sentence vacated*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976)). Additionally, "[h]ypothetical questions that seek to indoctrinate jurors regarding potential issues before the evidence has been introduced and before jurors have been instructed on applicable principles of law are similarly impermissible. *Id.* at 203, 491 S.E.2d at 647.

In *State v. Bond*, 345 N.C. 1, 478 S.E.2d 163 (1996), *cert. denied*, 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997), this Court ruled permissible the following *voir dire* question: "Would any of you feel like simply because [the defendant] did not pull the trigger, you could not consider the death penalty and follow the law concerning the death penalty?" *Id.* at 14, 478 S.E.2d at 169. The trial court in that case did not abuse its discretion since evidence of defendant's status as an accessory was uncontroverted, and the State was inquiring as to whether prospective jurors had the ability to impose a death sentence upon a defendant who served as an accessory to first-degree murder. *Id.* at 17, 478 S.E.2d at 171. The State correctly explained the applicable law to the panel of jurors, and at no point did the State use hypothetical examples, but rather phrased its questions in terms of facts alleged to be proved. *Id.*

In this case, we have reviewed the entire *voir dire* as reflected in the record and conclude that the trial court did not abuse its discretion in allowing the State's questions regarding prospective jurors' abilities to follow the law on acting in concert, aiding and abetting, and the felony murder rule. The State's questions contained an accurate summary of North Carolina law, and the State merely asked whether the prospective jurors would be able to follow the law. There is nothing in the record to suggest that the State was inquiring how a prospective juror would be inclined to vote under a given set of facts. This assignment of error is overruled.

In his next assignment of error, defendant contends that the trial court committed reversible error when it sustained several of the State's objections to admissible and relevant evidence. At the outset, we note that this Court has long held that:

STATE v. CHEEK

[351 N.C. 48 (1999)]

"A trial court's ruling on an evidentiary point will be presumed to be correct unless the complaining party can demonstrate that the particular ruling was in fact incorrect. *State v. Milby*, 302 N.C. 137, 273 S.E.2d 716 (1981). Even if the complaining party can show that the trial court erred in its ruling, relief ordinarily will not be granted absent a showing of prejudice. N.C.G.S. § 15A-1443(a) (1983)."

*State v. Mickey*, 347 N.C. 508, 520, 495 S.E.2d 669, 676 (quoting *State v. Herring*, 322 N.C. 733, 749, 370 S.E.2d 363, 373 (1988)), *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 106 (1998).

[7] First, defendant contends that the trial court erroneously sustained the State's objections to testimony offered by defendant in his attempt to impeach Detective Rodney Simmons, the officer in charge of the investigation conducted by the Wilmington Police Department. On the day defendant was arrested, he was interrogated by Detective Brian Pettus of the Wilmington Police Department. Defendant told Pettus that he waited for Nelson behind Hooters restaurant for approximately twenty minutes. Defendant contends that it was during this time that Nelson killed Ms. Oxendine. At trial, defendant called Simmons for direct examination and asked Simmons whether the police attempted to verify defendant's statements to Pettus in which he stated that he was outside Hooters restaurant during the time Nelson was supposedly killing Ms. Oxendine. The State objected to this line of questioning by defendant, and the trial court ultimately sustained the State's objections.

Defendant argues that Simmons' testimony was relevant for impeachment purposes because, during the State's case-in-chief, the State asked Simmons:

Q. What processing, if any, did you do of the Hooters patio or the parking lot, or any area of Hooters?

A. On the day of the incident, I did nothing.

Defendant sought to impeach Simmons through evidence which tended to show that Detective Simmons walked from the crime scene to the patio at Hooters, tried to ascertain from the Hooters' manager which waitress was serving on the patio the day of the murder, and took photographs of the area outside Hooters and the surrounding area. Defendant contends that all of these actions illustrate that Simmons did in fact know that defendant told Pettus that he waited

for Nelson behind Hooters. Because defendant's questions were relevant for impeaching Simmons, defendant argues the trial court erred in sustaining the State's objection.

However, after reviewing the record and transcript, we cannot conclude that defendant's questions would in fact serve to impeach Simmons. Defendant's argument fails to reveal the full context of Simmons' testimony during the State's direct examination:

Q. . . . Detective Simmons, after June 21st, 1996, when did you first hear of the defendant, Mr. Cheek?

A. It was approximately a week later.

Q. What processing, if any, did you do of the Hooters patio or the parking lot, or any area of Hooters?

A. On the day of the incident, I did nothing.

Q. After you learned of Mr. Cheek, what did you do, as far as processing the Hooters?

In response to this last question, Detective Simmons testified that once he learned about defendant, he inquired of the Hooters' manager as to who would have worked on the patio the day in question. Detective Simmons also testified that he took photographs of the restaurant. Thus, based on this testimony, the evidence defendant desired to elicit was before the jury, and we cannot conclude that defendant was erroneously prevented from impeaching Simmons' testimony. Accordingly, we cannot conclude that defendant suffered prejudice as a result of the trial court sustaining the State's objections.

[8] Second, defendant contends that the trial court erred in sustaining the State's objection when counsel for defendant asked defendant's expert witness, Dr. Everette Ellinwood, an expert in pharmacology, the following question:

Q. Do you feel Mr. Cheek's drug use, sleep deprivation and intense feeling that he needed to get to Wilmington, precluded him from being able to formulate a plan with another individual to kidnap and rob a cabdriver?

[PROSECUTOR]: Objection.

THE COURT: As phrased, that is sustained.

Defendant contends that because the trial court sustained the State's objection to that question, defendant was deprived of the opportunity to present evidence relevant to the issue of defendant's capacity to form the specific intent to commit the crimes charged. This Court has held that "an expert witness may testify concerning the defendant's ability to make and carry out plans, and the jury may consider such evidence when determining if defendant had the ability to form a specific intent." *State v. Lynch*, 340 N.C. 435, 467, 459 S.E.2d 679, 695 (1995), *cert. denied*, 517 U.S. 1143, 134 L. Ed. 2d 558 (1996).

We conclude that the trial court correctly sustained defense counsel's question "as phrased" since it was a leading question. A review of the record reveals that Dr. Ellinwood had an opportunity to, and did in fact, give his opinion as to defendant's ability to make and carry out plans. During defendant's direct examination of Dr. Ellinwood, the following colloquy occurred:

Q. Sir, when an individual is suffering the effects of hallucinative drugs and alcohol and, possibly, other drugs, do they often become focused on just one task?

[PROSECUTOR]: Objection.

THE COURT: Overruled, if he can answer.

THE WITNESS: Certainly with stimulant drugs, one can become very stereotyped in their thinking. In other words, it's an intense pursuit of one or two things, totally excluding other relevancies.

Q. What drugs would that be?

A. That would be cocaine, methamphetamine, primarily.

Q. In your opinion, sir, based on your interview and your education and training, do you have an opinion as to whether Jamey Cheek had the mental ability to formulate a plan with another individual to kidnap and rob a cabdriver?

[PROSECUTOR]: Objection.

THE COURT: Overruled.

Q. If you can just answer if you have an opinion as to that matter.

A. I don't have an opinion.

STATE v. CHEEK

[351 N.C. 48 (1999)]

Based on the foregoing testimony, we cannot conclude that defendant's expert was not permitted to give his opinion regarding defendant's inability to formulate a plan with Nelson.

Third, defendant contends that the trial court erred in excluding evidence concerning Nelson's conduct. However, in his discussion as to this particular portion of this assignment of error, defendant fails to refer to any specific ruling made by the trial court. Additionally, defendant does not provide any citations to the record or transcript. Because defendant does not present this portion of this assignment of error in a way for this Court to give it meaningful review, we conclude defendant has abandoned his argument under this assignment of error. N.C. R. App. P. 28(a); *see also State v. Wilson*, 289 N.C. 531, 223 S.E.2d 311 (1976).

**[9]** Fourth, because the trial court denied defendant's motion to compel the State to reveal the identity of the confidential informant, defendant filed a notice of intent to introduce hearsay statements. Defendant attempted to present to the jury the statements made by the confidential informant as corroborative evidence of defendant's statements that Nelson was a violent person, which in turn supported defendant's duress defense. Further, defendant also wanted to introduce those statements to corroborate defendant's assertion that Nelson robbed Shoney's without defendant's assistance or knowledge.

Following defendant's notice of intent to introduce hearsay, the State filed a motion *in limine* to exclude all evidence as to what Nelson allegedly told the confidential informant. The trial court granted the State's motion *in limine*, and then defendant requested the opportunity to make an offer of proof. The trial court initially denied defendant's offer of proof, but later reversed itself. Consequently, defendant conducted a *voir dire* of Detective Paul Harrington outside the jury's presence.

During direct examination on *voir dire*, Detective Harrington described the circumstances surrounding his meeting with the confidential informant who led the police to Nelson. Defendant's direct examination of Harrington concluded with the following colloquy:

Q. So, because of that information that you received, you were looking for Tom Nelson the night of the shootout at the Yellow Rose Saloon, is that correct?

A. That's incorrect.

Q. You were not looking for Tom Nelson that night?

A. We were looking for two people that night.

Q. Was Tom Nelson one of those two people?

A. Yes, he was.

[DEFENSE COUNSEL]: Thank you, that's all the questions I have.

However, during the State's cross-examination of Detective Harrington, the following ensued:

Q. What did he [the informant] tell you?

A. He stated that Tom stated that he did the robbery himself but that he had someone outside, watching his back.

Q. What robbery was he talking about?

A. He was talking about the Shoney's robbery.

Q. Okay. And that—what did Tom tell him, other than he had done the Shoney's robbery?

A. That he had someone outside, watching his back.

Q. Okay. Outside what?

A. Outside the restaurant, watching his back.

Defendant asserts that the statements made to the confidential informant should have been admitted as corroborative evidence that Nelson committed the Shoney's robbery alone. However, because the evidence indicates that Nelson did not act alone when he robbed Shoney's, we cannot conclude that defendant suffered prejudice as a result of the trial court's ruling.

Fifth, defendant argues further that the trial court erred in repeatedly denying defendant's attempts to present evidence supporting his contentions that Nelson was a violent person, which would in turn corroborate defendant's contentions that he was justified in his fear of Nelson. In addition to the statements that Nelson made to the informant, defendant attempted to present evidence of Nelson's diary. For the reasons stated above, as well as for the reasons stated in our discussion of defendant's first assignment of error, we conclude that the trial court correctly sustained the State's objections to the admission of this evidence.

**[10]** Finally, defendant contends that the trial court prevented him from introducing evidence, through the testimony of Amanda Beck, Nelson's girlfriend, that Nelson owned a gun and that Ms. Beck had seen him shoot the gun at Shawn Kronstedt. Additionally, defendant sought to introduce a letter written by Nelson to Ms. Beck in which Nelson indicated that he would rather die than be caught by the police. Defendant contends that this evidence was relevant to defendant's affirmative defense of duress and that he only accompanied Nelson as a result of fear.

In this regard, there was never a factual dispute that Nelson owned a gun and used it in the kidnapping and robbery of Oxendine. During the State's case-in-chief, the State, with defendant's agreement, presented a stipulation that the bullet fired into Oxendine's head came from Nelson's gun, and that the same gun was eventually recovered beside Nelson's body. With regard to defendant's attempt to introduce evidence of Nelson's acts of violence towards Kronstedt, as well as Nelson's letter stating his preference of suicide over prison, this evidence is not relevant to defendant's duress defense. As we have previously stated, in order for defendant to successfully invoke a duress defense, defendant would have to present evidence that he feared he would "suffer immediate death or serious bodily injury if he did not so act." *State v. Strickland*, 307 N.C. at 299, 298 S.E.2d at 661. For the reasons discussed in our consideration of defendant's first assignment of error, evidence that serves only to demonstrate that Nelson was a violent person is not sufficient, in light of the State's evidence in this case, to show that Nelson exercised active and immediate coercion over defendant at the times they committed the crimes against Oxendine. This assignment of error is overruled.

In his next assignment of error, defendant asserts that the trial court erroneously denied his specific requests for jury instructions on (1) "mere presence" with regard to the charges of first-degree kidnapping and robbery, and (2) "drugged condition" with regard to the first-degree murder charge. Defendant argues that the instructions he requested were both correct and supported by the evidence, and that the trial court's denial amounted to reversible constitutional error.

**[11]** This Court has held that a court must give a requested instruction if it is a correct statement of the law and is supported by the evidence. *State v. Rose*, 323 N.C. 455, 458, 373 S.E.2d 426, 428 (1988). In

the case *sub judice*, the evidence fully shows that defendant actively and intelligently participated in the kidnapping and robbery of Ms. Oxendine. The evidence indicates that defendant held the victim while Nelson bound her hands, that defendant drove the stolen taxi, and that defendant put the unconscious victim in either the backseat or the trunk of the taxi. Defendant conceded that he did take part in these activities. However, defendant argued at trial that he was not criminally liable for his actions since his participation was coerced. Thus, all that was left for the jury to determine was whether defendant's acts were willing or unwilling.

Under the "mere presence" doctrine, the fact that defendant was present " 'at the scene of the crime, even though he is in sympathy with the criminal act and does nothing to prevent its commission, does not make him guilty of the offense.' " *State v. Ligon*, 332 N.C. 224, 242, 420 S.E.2d 136, 146 (1992) (quoting *State v. Sanders*, 288 N.C. 285, 290, 218 S.E.2d 352, 357 (1975), *cert. denied*, 423 U.S. 1091, 47 L. Ed. 2d 102 (1976)). However, there is undisputed evidence that defendant did actively participate in the kidnapping and robbery of the victim and thus could not have been "merely present" at the scene of the crime. Since defendant admits that he did participate in the robbery and kidnapping of the victim, defendant is not entitled to an instruction on "mere presence."

[12] With regard to defendant's contention that the trial court erroneously deprived him of an instruction on voluntary intoxication as a defense to the first-degree murder charge, this Court has repeatedly stated:

It is "well established that an instruction on voluntary intoxication is not required in every case in which a defendant claims that he killed a person after consuming intoxicating beverages or controlled substances." *State v. Baldwin*, 330 N.C. 446, 462, 412 S.E.2d 31, 41 (1992). Evidence of mere intoxication is not enough to meet defendant's burden of production. *State v. Mash*, 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988). Before the trial court will be required to instruct on voluntary intoxication, defendant must produce substantial evidence which would support a conclusion by the trial court that at the time of the crime for which he is being tried

"defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. In absence of

some evidence of intoxication to such degree, the court is not required to charge the jury thereon."

*State v. Strickland,* 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987) (quoting *State v. Medley,* 295 N.C. 75, 79, 243 S.E.2d 374, 377 (1978)) (citations omitted).

*State v. Billings,* 348 N.C. 169, 182-83, 500 S.E.2d 423, 431, *cert. denied,* —— U.S. ——, 142 L. Ed. 2d 431 (1998).

Defendant testified on direct examination that on the morning of Oxendine's murder:

I got up, I took a shower. I had bought two hits of acid earlier, tooken [sic] one that night, and I took the other one after I got out of the shower.

On cross-examination, defendant and the prosecutor engaged in the following colloquy:

A. Yeah. In the morning when Tom [Nelson] freaked out, it killed my buzz.

Q. Excuse me?

A. When Tom freaked out at Friends, it would, I guess you say, ruined my high or killed my buzz. When you're high or on drugs, if you get shocked real bad, your buzz goes away quick.

Q. You mean when Tom was bludgeoning Miss Oxendine behind the Friends Lounge, it killed your buzz?

A. When—what I'm saying is, when Tom pulled out a gun and started acting crazy, I wasn't no longer high.

Q. So he sobered you up?

A. Yeah.

Additionally, Detective Brian Pettus of the Wilmington Police Department testified that when he questioned defendant, defendant told him that he had not taken any drugs the day of the murder. Regardless of this conflicting testimony, the evidence has established that defendant had the ability to drive the stolen cab from Jacksonville to Wilmington, which is a distance of approximately fifty-one miles. The evidence also shows that defendant had the capacity to discuss with the police, in detail, the events which occurred before and after defendant arrived in Wilmington. Based on

these facts, we cannot conclude that defendant produced sufficient evidence from which a jury could conclude that defendant was so intoxicated that he was "utterly incapable" of forming the specific intent to commit first-degree murder. *State v. Strickland*, 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987). This assignment of error is overruled.

**[13]** In his next assignment of error, defendant contends that the trial court erred in submitting two separate (e)(5) aggravating circumstances, that the murder was committed during the course of a robbery and that it was committed during the course of a kidnapping. N.C.G.S. § 15A-2000(e)(5) (1997). The jury found this aggravating circumstance twice, once for robbery and once for kidnapping. This Court has recently reaffirmed that N.C.G.S. § 15A-2000(e) allows for " 'the submission of separate aggravating circumstances pursuant to the same statutory subsection if the evidence supporting each is distinct and separate.' " *State v. Trull*, 349 N.C. 428, 454, 509 S.E.2d 178, 195 (1998) (quoting *State v. Bond*, 345 N.C. at 34, 478 S.E.2d at 181), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 80 (1999). Additionally, this Court has specifically ruled that a trial court may allow multiple submission of the (e)(5) aggravating circumstance. *Id.* Since the State presented distinct evidence that defendant committed both robbery and kidnapping against the victim during the course of the murder, we conclude the trial court properly submitted the (e)(5) circumstance twice.

**[14]** Under this same assignment of error, defendant also contends that the trial court erred in submitting the (e)(9) aggravating circumstance, that the murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9). Defendant argues that the (e)(9) aggravating circumstance should not have been admitted because the evidence was insufficient to show that the murder was especially heinous, atrocious, or cruel.

In considering when the (e)(9) aggravating circumstance may be submitted, this Court has stated:

> Killings which are physically agonizing for the victim or which are in some other way dehumanizing, or killings which are less violent but involve the infliction of psychological torture, including placing the victim in agony in his last moments, aware of, but helpless to prevent, impending death, are two more types of murders warranting submission of the circumstance.

*State v. Syriani*, 333 N.C. 350, 391, 428 S.E.2d 118, 140, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). In the present case, Dr. Thomas Clark, the doctor who performed the autopsy on Ms. Oxendine's corpse, testified that he believed she was alive when her taxicab was set on fire. The State questioned Dr. Clark as follows:

Q. What did that tell you, when you found soot in her air passages and her nose?

A. The presence of this soot shows that she was alive at the time the fire began.

Q. Now, were some tests done to determine her carbon monoxide level?

A. Yes.

Q. Why was that done?

A. Carbon monoxide is also a byproduct of incomplete combustion, meaning that, whenever there's a fire that isn't burning completely, which is most fires, it makes soot and carbon monoxide. . . . The significance of this is that the presence of a carbon monoxide saturation of greater than 70 percent shows me that this woman was alive at the beginning of the fire and died as a result of the fire because, in order to get a carbon monoxide saturation that high, you have to be breathing and your heart has to be beating, and you cannot live with a carbon monoxide of greater than 70 percent. So you have to be alive to get it, and it is fatal 100 percent of the time.

. . . .

Q. Okay. Thank you. Dr. Clark, based on the autopsy of Barbara Oxendine, do you have an opinion as to the cause of death?

A. Yes, I do.

Q. What is that opinion?

A. Death was due to carbon monoxide poisoning.

Q. By that, you're referring to fire?

A. That's correct.

The record does not contain definitive evidence showing that Ms. Oxendine was conscious when she was transported to Wilmington and when the fire began. Counsel for defendant questioned Dr. Clark

as to what impact the gunshot wound may have had on Ms. Oxendine's consciousness:

Q. Dr. Clark, the bullet wound that you found in Miss Oxendine, that would have been, within a few minutes, a fatal wound, would it not?

A. It would have been fatal, not necessarily a few minutes, and that's a difficult question, because it depends on exactly what you consider to be death. It's clear that she was breathing at the time that the fire started. I don't know exactly when the gunshot wound occurred, in relation to the beginning of the fire, and I don't know how long it may have been there. It is conceivable, without the fire, that she could have lived, meaning breathing and with a heartbeat, some several hours. That's unlikely. It was probably a much shorter time. It's also possible that it was fatal, or it would have been fatal in a shorter time.

Q. In your opinion, sir, would it have rendered her unconscious?

A. It is likely that it would have rendered her unconscious, but I cannot say for sure. It did not directly injure any part of the brain that result—that would have resulted in a loss of consciousness, but it is likely that it indirectly injured those parts of the brain.

Q. And your findings are that, basically, it was ingesting smoke that caused her death?

A. That is correct.

In determining whether evidence is sufficient to support the (e)(9) aggravating circumstance, that evidence should be "viewed in the light most favorable to the State." *State v. Anderson*, 350 N.C. 152, 186, 513 S.E.2d 296, 316 (1999). Based upon the foregoing testimony, we conclude that the evidence, although not conclusive, was sufficient for a jury to find that not only was the victim alive when the taxicab was set on fire, but that she was aware of her impending death. Therefore, the trial court did not err in submitting this aggravating circumstance to the jury. This assignment of error is overruled.

In his next assignment of error, defendant contends that the trial court committed reversible error by failing to submit one of defendant's requested nonstatutory mitigating circumstances that was supported by evidence in the record. Defendant also contends that the trial court erred in denying defendant's request for a peremptory instruction on three statutory mitigating circumstances.

**[15]** First, the trial court declined to give the following proposed nonstatutory mitigating circumstance: "Nelson initiated the plan that led to kidnapping Barbara Oxendine." The basis for the trial court's refusal to submit this circumstance was that it was subsumed in the (f)(4) and (f)(5) statutory circumstances. The trial court did submit, at defendant's request, the (f)(4) mitigating circumstance, that "defendant was an accomplice in or accessory to the capital felony committed by another person and his participation was relatively minor." N.C.G.S. § 15A-2000(f)(4). Defendant also requested the trial court to submit the (f)(5) statutory mitigating circumstance, that "defendant acted under duress or under the domination of another person." N.C.G.S. § 15A-2000(f)(5). The trial court separated this circumstance into two separate mitigators, thus submitting it in the form of two mitigating circumstances. Additionally, the trial court submitted twenty-four nonstatutory mitigating circumstances which defendant requested.

This Court has ruled that "[i]f a proposed nonstatutory mitigating circumstance is subsumed in other statutory or nonstatutory mitigating circumstances which are submitted, it is not error for the trial court to refuse to submit it." *State v. Richmond*, 347 N.C. 412, 438, 495 S.E.2d 677, 691, *cert. denied,* —— U.S. ——, 142 L. Ed. 2d 88 (1998). We conclude that the trial court correctly ruled that the nonstatutory mitigating circumstance that "Nelson initiated the plan that led to kidnapping Barbara Oxendine" was subsumed in other mitigating circumstances submitted to the jury.

**[16]** With regard to the trial court's refusal to peremptorily instruct the jury as to the statutory mitigating circumstances, this Court has held that a " 'trial court should, if requested, give a peremptory instruction for any mitigating circumstance, whether statutory or nonstatutory, if it is supported by uncontroverted and manifestly credible evidence.' " *Id.* at 440, 495 S.E.2d at 692 (quoting *State v. McLaughlin*, 341 N.C. 426, 449, 462 S.E.2d 1, 13 (1995), *cert. denied,* 516 U.S. 1133, 133 L. Ed. 2d 879 (1996)).

Defendant argues that the trial court should have given a peremptory instruction on the (f)(2) statutory mitigating circumstance, that defendant was under the influence of a mental or emotional disturbance at the time of the murder. Defendant also argues that the trial court should have peremptorily instructed the jury on the (f)(6) circumstance, that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law

STATE v. CHEEK

[351 N.C. 48 (1999)]

was impaired. In support of these two circumstances, defendant's expert witness, Dr. Ellinwood, a psychiatrist with a concentration on the effects of stimulant abuse, engaged in the following colloquy with defendant's counsel:

> Q. In your opinion, sir, based on your interview and your education and training, do you have an opinion as to whether Jamey Cheek had the mental ability to formulate a plan with another individual to kidnap and rob a cabdriver?
>
> [PROSECUTOR]: Objection.
>
> THE COURT: Overruled.
>
> Q. If you can just answer if you have an opinion as to that matter.
>
> A. I don't have an opinion.

Defendant's counsel repeated this line of questioning again on redirect examination of Dr. Ellinwood:

> Q. Sir, do you have an opinion, satisfactory to yourself, about Mr. Cheek's mental ability to make plans that morning?
>
> A. I think he was extremely—
>
> [PROSECUTOR]: Objection.
>
> THE COURT: Well, that calls for a yes or no.
>
> THE WITNESS: Yes.
>
> THE COURT: You may explain your answer.
>
> THE WITNESS: I think he was extremely confused. His memory, immediate memory, ongoing memory, was greatly impaired. He didn't even remember, according to my interview with him, why he was at the Navy hospital, and that's when Tom [Nelson] showed up, he states, and told him he would take care of things. Mr. Cheek stated he already had a ride to Wilmington with someone who had a truck, and there was no reason for him to formulate a kidnapping intent.
>
> . . . .
>
> THE WITNESS: So basically, I think he was very confused, and Mr. Nelson came along and said, I will take care of things.

Dr. Ellinwood also stated that his expert opinion was entirely based on his interview with defendant. Dr. Ellinwood's testimony directly conflicts with evidence that defendant told Detective Pettus that he had consumed "one Pepsi at Hooters and he had done no drugs." Additionally, defendant contradicts his claim that he was impaired when he testified that watching Nelson hit the victim with a handgun "killed [his] buzz." Since there is contradictory evidence supporting the (f)(2) and (f)(6) mitigators in this case, we cannot conclude that defendant's evidence was "uncontroverted and manifestly credible" so as to warrant a peremptory instruction.

[17] Defendant also argues that the trial court erred in failing to give a peremptory instruction on the (f)(5) mitigating circumstance, that defendant acted under duress or under the domination of another person, which the trial court submitted to the jury in the form of two statutory mitigating circumstances. Defendant's evidence supporting his contention that he acted only out of fear of Nelson is undermined by the evidence showing defendant's efforts to reunite with Nelson once they were separated after the murder. The trial court did not err in refusing to peremptorily instruct the jury on this issue. Accordingly, this assignment of error is overruled.

[18] In his next assignment of error, defendant contends that the trial court committed reversible error when it instructed the jury as to Issue Three in response to the jury's question as to whether it could strike the word "unanimous" from the language in Issue Three. When the trial court originally instructed the jury on Issue Three, the trial court stated:

> If you unanimously find, beyond a reasonable doubt, that the mitigating circumstances found are insufficient to outweigh the aggravating circumstances found, you would answer issue three "yes." If you unanimously fail to so find, you would answer issue three "no." If you answer issue three "no," it will be your duty to recommend that the defendant be sentenced to life imprisonment. If you answer issue three "yes," you must consider issue four.

Those instructions were taken verbatim from the pattern jury instructions on Issue Three, which this Court has repeatedly affirmed. *State v. Keel*, 337 N.C. 469, 493-94, 447 S.E.2d 748, 761-62 (1994), *cert. denied*, 513 U.S. 1198, 131 L. Ed. 2d 147 (1995).

However, less than two hours after the jury began its sentencing deliberations, the jury sent a written question to the trial court.

Without bringing the jurors into the courtroom, the trial court stated the jury's question for the record:

> The question submitted by the jury is, do you unanimously find, beyond a reasonable doubt—of course, this is the issue three— do you unanimously find, beyond a reasonable doubt, that the mitigating circumstance or circumstances found is or are insuffi- cient to outweigh the aggravating circumstances [sic] circum- stance or circumstances found by you? The question was, we could not answer issue three a unanimous "yes." A no answer indicates a verdict of life imprisonment. The recommendation page says, quote, we unanimously agree. And the question is, can we cross out the word unanimous on the recommendation? I believe my instructions were that, relative to issue three, the rec- ommendation must be unanimous.

The trial court then called the jury into the courtroom and instructed the jury that "[i]t is the duty of the jury to unanimously answer issue three." The trial court then noted for the record that the time was "4:55 o'clock p.m." and thus the trial court excused the jurors until the next morning. Once the jurors were excused, defendant objected to the trial court's instruction, and the trial court denied any motion on defendant's part to modify the instructions.

The following morning, the trial court stated that it would rein- struct the jury as to Issue Three. Counsel for defendant asked that the trial court reinstruct the jury on the "whole page" of instructions con- taining Issue Three. The trial court and defendant's counsel then engaged in the following colloquy:

> [DEFENSE COUNSEL]: Your Honor, they asked if issue three had to be unanimous. Well, it spells it out quite clearly that it does have to be unanimous, but there's other issues that also have to be unanimous, and I'm concerned that if they are questioning whether issue three has to be unanimous when it clearly states so, are they clear that some other issues have to be unanimous? And, unlike a case where you have somebody with several charges and the jury just doesn't question as to what's—could you read the instruction again on possession or something, taking one issue out of context in a sentencing instruction, I think, could be confusing and misleading, and we would ask that the whole instruction be read again. I'm particularly concerned over the fact that they didn't understand unanimity in one issue. Do they understand it in the other issues? I mean, how can you pull—

STATE v. CHEEK

[351 N.C. 48 (1999)]

THE COURT: They referred strictly to issue three, and it says, we cannot answer a unanimous yes. A "no" answer indicates a verdict of life imprisonment. The recommendation page says we unanimously—it says we unanimously. Can we cross out the word unanimous? I am going to readvise what I—

[DEFENSE COUNSEL]: Your Honor, based on that statement, we would ask it be declared a hung jury.

THE COURT: That is denied at this juncture.

[DEFENSE COUNSEL]: Yes, sir. Thank you, sir.

THE COURT: What else do you have?

[DEFENSE COUNSEL]: Nothing, sir.

THE COURT: I don't know what you suggested yesterday, but what I advised them was entirely correct under the law.

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: All right. I will pick up and I will read the bottom of 43, that paragraph beginning at the bottom of 43 down to 44, and I will also read the footnote on page six which will clarify any question, which reads, the answers to issue one, three and four, whether affirmative or negative, must be unanimous. I think that will respond to every question each of you had. All right, anything else?

[PROSECUTOR]: Not from the State, Your Honor.

[DEFENSE COUNSEL]: No, sir.

The trial court then called the jurors into the courtroom and instructed them as follows:

Now, going back to your inquiry yesterday, I gave you an answer and I will further elaborate at this time relative to issue three about which your question revolved. If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances. When deciding this issue, each juror should consider any mitigating circumstance or circumstances that the juror determined to exist, by a preponderance of the evidence, in issue two. In so doing, you are the sole judges of the weight to be given to any individual circumstance which you find, whether aggravating or mitigating.

You should not merely add up the number of aggravating circumstances and mitigating circumstances; rather, you must decide, from all the evidence, what value to give to each circumstance and then weigh the aggravating circumstances so valued against the mitigating circumstances so valued and, finally, determine whether the mitigating circumstances are insufficient to outweigh the aggravating circumstances.

If you unanimously find, beyond a reasonable doubt, that the mitigating circumstances found are insufficient to outweigh the aggravating circumstances found, you would answer issue three "yes." If you unanimously fail to so find, you would answer issue three "no." If you answer issue three "no," it would be your duty to recommend that the defendant be sentenced to life imprisonment. If you answer issue three "yes," you must consider issue four. And I state further to you that the answers to issues one, three and four, whether affirmative or negative, must be unanimous.

The trial court then told the jurors that they could return to the jury room and resume deliberations. Once the jurors left, the trial court asked whether there was "[a]nything further from the State or the defendant." Counsel for both the State and the defendant answered in the negative.

Defendant now contends that the trial court erred in its initial instruction that the jury must either unanimously answer "yes" or "no" to the question presented in Issue Three on the "Issues and Recommendation as to Punishment" form. This Court has previously considered this issue and has concluded that a trial court has no duty to instruct a jury that it need not be unanimous in order to answer "no" on the "Issues and Recommendation as to Punishment" form. *State v. McCarver*, 341 N.C. 364, 462 S.E.2d 25 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996). In *McCarver*, this Court explained the rationale behind the unanimity requirement:

In a capital sentencing proceeding, any jury recommendation requiring a sentence of death or life imprisonment must be unanimous. N.C. Const. art. I, § 24; N.C.G.S. § 15A-2000(b) (Supp. 1994). The policy reasons for the requirement of jury unanimity are clear. First, the jury unanimity requirement "is an accepted, vital mechanism to ensure that *real* and *full* deliberation occurs in the jury room, and that the jury's ultimate decision will reflect the conscience of the community." *McKoy v. North Carolina*, 494

STATE v. CHEEK

[351 N.C. 48 (1999)]

U.S. 433, 452, 108 L. Ed. 2d 369, 387 (1990) (Kennedy, J., concur-
ring) (emphasis added). Second, the jury unanimity requirement
prevents the jury from evading its duty to make a sentence rec-
ommendation. If jury unanimity is not required, then a jury that
was uncomfortable in deciding life and death issues simply could
"agree to disagree" and escape its duty to render a decision. This
Court has refused to make any ruling which would tend to
encourage a jury to avoid its responsibility by any such device.
For example, we have expressly stated that a jury instruction that
a life sentence would be imposed if a jury could not unanimously
agree should never be given because it would be "tantamount to
'an open invitation for the jury to avoid its responsibility and to
disagree.' " *State v. Smith,* 305 N.C. 691, 710, 292 S.E.2d 264, 276
(quoting *Justus v. Commonwealth,* 220 Va. 971, 979, 266 S.E.2d
87, 92 (1980)), *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982),
*reh'g denied,* 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983). The jury
may not be allowed to arbitrarily or capriciously take any such
step which will require the trial court to *impose or reject* a sen-
tence of death. *State v. Pinch,* 306 N.C. 1, 33, 292 S.E.2d 203, 227,
*cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied,*
459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other
grounds by State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988),
*and by State v. Robinson,* 336 N.C. 78, 443 S.E.2d 306 (1994)
[, *cert. denied,* 513 U.S. 1089, 130 L. Ed. 2d 650 (1995)].
Thoughtful and *full* deliberation in an effort to achieve unanimity
has only a salutary effect on our judicial system: It tends to pre-
vent arbitrary and capricious sentence recommendations.

Since the sentence recommendation, *if any,* must be unani-
mous under constitutional and statutory provisions, and particu-
larly in light of the overwhelming policy reasons for a unanimity
requirement, we conclude that any issue which is *outcome deter-
minative* as to the sentence a defendant in a capital trial will
receive—whether death or life imprisonment—must be
answered unanimously by the jury. That is, the jury should
answer Issues One, Three, and Four on the standard form used in
capital cases either unanimously "yes" or unanimously "no."

*McCarver,* 341 N.C. at 389-90, 462 S.E.2d at 39. Most importantly, this
Court then emphasized:

If a jury is unable to agree as to Issue One, Issue Two, or
Issue Three after a reasonable time, the *trial court* will of course

be required to acknowledge that fact and itself enter a judgment of imprisonment for life. N.C.G.S. § 15A-2000(b). The *jury* should not be made aware of this state of the law, however, as to inform the jury that its failure to agree on determinative issues will result in a sentence of life imprisonment would be an open invitation to the jury—or a single juror—to avoid its responsibility to *fully* deliberate and to force a recommendation of life by the simple expedient of disagreeing. *State v. Smith,* 305 N.C. at 710, 292 S.E.2d at 276. Thus, it has been our law that even when the jury specifically asks what the ultimate result will be if it fails to reach unanimity, the trial court may only inform the jurors that their inability to reach unanimity "should not be their concern but should simply be reported to the court." *State v. Smith,* 320 N.C. 404, 422, 358 S.E.2d 329, 339 (1987).

*McCarver,* 341 N.C. at 394, 462 S.E.2d at 42.

Defendant argues that our decision in *State v. Smith,* 320 N.C. 404, 358 S.E.2d 329 (1987), controls this issue. In *Smith,* the jury recessed from sentencing deliberations to ask the trial court the following question: "If the jurors' decision is not unanimous, is this automatic life imprisonment or does the jury have to reach a unanimous decision regardless?" *Id.* at 420, 358 S.E.2d at 338. Thus, the jury in *Smith* was inquiring *"into the result of its failure to reach a unanimous verdict." Id.* at 422, 358 S.E.2d at 339. This Court therefore concluded in *Smith* "that *upon inquiry by the jury* the trial court must inform the jurors that their inability to reach a unanimous verdict should not be their concern but should simply be reported to the court." *Id.*

However, the instant case is distinguishable from *Smith* since the jury in this case did not inquire as to the ultimate result in the event that the jurors failed to reach a unanimous decision. This jury merely asked whether the answer to Issue Three must be unanimous. We conclude that the trial court correctly instructed the jurors that Issue Three required a unanimous answer. This assignment of error is overruled.

[19] In his next assignment of error, defendant contends that the trial court erred in failing to declare the jury deadlocked on a sentencing recommendation. The jury began its sentencing deliberations at approximately 3:00 p.m. on 2 July 1997 and continued until approximately 5:00 p.m. that day. It was just before 5:00 p.m. on 2 July 1997 that the jury inquired whether its recommendation as to Issue Three

could be nonunanimous. At this point, the trial court instructed the jury that its answer to Issue Three had to be unanimous, excused the jurors until the following morning and overruled defendant's objection to its instruction. The next morning, 3 July 1997, the trial court denied defendant's motion for a hung jury and reinstructed the jury as to Issue Three. The jury then resumed its deliberations at 9:30 a.m. that morning and took its normal breaks. At 6:50 p.m. on 3 July 1997, defendant again requested the trial court to declare a hung jury and impose the mandatory life sentence. The trial court then called the jury into the courtroom and stated:

> And ladies and gentlemen of the jury, let me make this inquiry, if you will, in the event you want to continue deliberating this evening, we will make some arrangements to have some fast food brought in to you. If you desire to be released and return Monday at 10:00 o'clock a.m. to resume your deliberations, we can also do that. So I make the inquiry. Those who would prefer to continue deliberating, into the evening, raise your hand, if you will. One, two, three, four, five, six, seven, eight, nine, ten, eleven.

Upon this showing, the trial court concluded that a majority of the jurors would rather continue deliberating that day instead of stopping, and the jury was allowed to resume its deliberations. At 8:19 p.m. that evening, 3 July 1997, the jury returned its sentence recommendation of death.

At the time defendant made his second motion to the trial court to declare the jury "hung," the jury had deliberated a total of approximately nine hours over a two-day period. Defendant contends that under the circumstances of this case, nine hours was an unreasonable period of time for the jury to deliberate. Defendant argues that the trial court erred by not instructing the jury as to what it should do in the event it could not reach a unanimous verdict and in failing to instruct as to each juror's individual responsibility as set out in N.C.G.S. § 15A-1235(b).

However, defendant's trial counsel did not request the court to instruct the jury on its failure to reach a verdict, nor did defense counsel request an instruction pursuant to N.C.G.S. § 15A-1235. Therefore, this Court must review the trial court's failure to give such instructions under the plain error rule. *State v. Frye*, 341 N.C. 470, 495-96, 461 S.E.2d 664, 676-77 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996).

N.C.G.S. § 15A-1235(c) provides:

> If it appears to the judge that the jury has been unable to agree, the judge may require the jury to continue its deliberations and may give or repeat the instructions provided in subsections (a) and (b). The judge may not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

N.C.G.S. § 15A-1235(c) (1997). This Court has consistently held that " '[i]t is clearly within the sound discretion of the trial judge as to whether to give an instruction pursuant to N.C.G.S. § 15A-1235(c).' " *State v. Fernandez*, 346 N.C. 1, 22, 484 S.E.2d 350, 363 (1997) (quoting *State v. Williams*, 315 N.C. 310, 326-27, 338 S.E.2d 75, 85 (1986). Evidence in the record reflects that although the jury deliberated for more than nine hours, it never deliberated longer than two hours and thirty-seven minutes without a break. The record is devoid of any evidence which suggests that the jury indicated that it was deadlocked or was not making progress in its deliberations. Finally, this was a lengthy trial where the State and defendant presented a substantial quantity of conflicting evidence. In light of these circumstances, the fact that this jury had not reached unanimity on one issue, Issue Three, after deliberating less than two hours is, we conclude, a characteristic and natural part of the deliberative process in a sentencing proceeding determinative of life or death. Under such circumstances, we cannot conclude that the trial court erred in failing to declare the jury deadlocked or that the trial court erred by not instructing the jury *ex mero motu* as to the provisions set out in N.C.G.S. § 15A-1235. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises nine issues which he concedes have been previously decided contrary to his position by this Court: (1) the trial court erred by failing to prohibit the State from death qualifying the jury; (2) the trial court erred by failing to conduct a *voir dire* of prospective jurors concerning parole eligibility; (3) the trial court erred by failing to strike the death penalty and to eliminate the death penalty in that the North Carolina death penalty is unconstitutional, arbitrary, and discretionary on its face and as applied in this case; (4) the trial court erred in failing to bifurcate the trial; (5) the trial court erred in failing to conduct individual *voir dire* and sequestration of the jury; (6) the trial court erred in instructing the jury that all evidence in both phases of the trial was competent for the jurors' consideration

STATE v. CHEEK

[351 N.C. 48 (1999)]

in that it permitted an unguided, discretionary return of a death sentence based on nonstatutory aggravating circumstances; (7) the trial court's use of the terms "satisfaction" and "satisfy," in defining the burden of proof for applicable mitigating circumstances, made consideration discretionary with the sentencing jurors; (8) the trial court erred in instructing the jury that it could reject a submitted non-statutory mitigating circumstance if it found that circumstance not to have mitigating value; and (9) the trial court's instructions regarding the mitigating circumstances in Issues Three and Four gave discretion to the jury to reject proven mitigating circumstances.

Defendant raises these issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for possible further judicial review of this case. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we must now review the record and determine: (1) whether the evidence supports the aggravating circumstances found by the jury and upon which the sentencing court based its sentence of death; (2) whether the sentence was entered under the influence of passion, prejudice or any other arbitrary factor; and (3) whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). We have thoroughly reviewed the record, transcript and briefs in this case. We conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

[20] In the present case, defendant was found guilty of first-degree murder under the theories of premeditation and deliberation and felony murder. He was also convicted of robbery with a dangerous weapon and first-degree kidnapping. Following a capital sentencing proceeding, the jury found the three submitted aggravating circumstances: (i) the murder was committed while defendant was engaged in the commission of a robbery, N.C.G.S. § 15A-2000(e)(5); (ii) the murder was committed while defendant was engaged in the

commission of a kidnapping, N.C.G.S. § 15A-2000(e)(5); and (iii) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

The trial court submitted eight statutory mitigating circumstances to the jury, including the "catchall" statutory mitigating circumstance, N.C.G.S. § 15A-2000(f)(9). However, the jury only found two statutory mitigating circumstances, that defendant acted under the domination of another person, N.C.G.S. § 15A-2000(f)(5), and the defendant's age at the time of the crime, N.C.G.S. § 15A-2000(f)(7). Of the twenty-four nonstatutory mitigating circumstances submitted, the jury found ten to exist and have mitigating value.

One purpose of our proportionality review is to "eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury." *State v. Lee*, 335 N.C. 244, 294, 439 S.E.2d 547, 573, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). In conducting proportionality review, we compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). This Court has found the death penalty disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. First, the jury convicted defendant under the theory of premeditation and deliberation. This Court has stated that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). The jury in this case also found all three of the aggravating cir-

cumstances submitted. This Court has not found the death penalty disproportionate in any case where the jury has found three aggravating circumstances. *State v. Trull*, 349 N.C. at 458, 509 S.E.2d at 198. Further, of the cases in which this Court has found the death penalty disproportionate, the jury found the especially heinous, atrocious, or cruel aggravating circumstance in only two cases. *Stokes*, 319 N.C. 1, 352 S.E.2d 653; *Bondurant*, 309 N.C. 674, 309 S.E.2d 170.

Neither *Stokes* nor *Bondurant* is similar to this case. As we have noted, defendant here was convicted of murder on the basis of premeditation and deliberation as well as under the felony murder rule. The defendant in *Stokes*, however, was convicted solely on the basis of the felony murder rule. In *Bondurant*, the defendant exhibited his remorse, as he "readily spoke with policemen at the hospital, confessing that he fired the shot which killed [the victim]." *Bondurant*, 309 N.C. at 694, 309 S.E.2d at 183. The defendant in the case *sub judice* "did not exhibit the kind of conduct we recognized as ameliorating in *Bondurant*." *State v. Flippen*, 349 N.C. 264, 278, 506 S.E.2d 702, 711 (1998), *cert. denied*, —— U.S. ——, 143 L. Ed. 2d 1015 (1999).

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all of the cases in the pool when engaging in our duty of proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It suffices to say here that we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

Finally, this Court has noted that similarity of cases is not the last word on the subject of proportionality. *State v. Daniels*, 337 N.C. 243, 287, 446 S.E.2d 298, 325 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). Similarity "merely serves as an initial point of inquiry." *Id.* Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

Based on the foregoing and the entire record in this case, we cannot conclude as a matter of law that the sentence of death was excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.

Justice FREEMAN did not participate in the consideration or decision of this case.