STATE OF NORTH CAROLINA v. EDDIE GOLDEN, JR.

No. COA00-231

(Filed 15 May 2001)

## 1. Homicide— felony murder—voluntary intoxication—defense to robbery

The trial court committed prejudicial error in a first-degree murder case based on the felony murder rule by failing to instruct the jury on defendant's voluntary intoxication as a possible defense to the underlying felony of robbery, because: (1) substantial evidence was presented that defendant was intoxicated from consuming a number of beers, a half of a fifth of gin, and two rocks of crack cocaine in roughly four hours without eating anything; (2) a doctor testified that this amount of alcohol, combined with defendant's past alcohol abuse, drug use, and low I.Q. would impair defendant's ability to form the specific intent to rob; and (3) the jury found defendant not guilty of premeditated and deliberated murder, indicating defendant was incapable of forming specific intent, while determining that defendant was capable of the specific intent to rob.

## 2. Homicide— first-degree murder—failure to instruct on second-degree murder

The trial court committed harmless error in a first-degree murder case by failing to instruct the jury on second-degree murder when defendant presented evidence of voluntary intoxication but was acquitted of premeditated and deliberated murder and convicted of felony murder, because second-degree murder cannot be a lesser included offense of first-degree murder based on the felony murder rule alone.

Appeal by defendant from judgment entered 9 March 1999 by Judge Judson D. DeRamus, Jr. in Guilford County Superior Court. Heard in the Court of Appeals 19 February 2001.

*Attorney General Michael F. Easley, by Assistant Attorney General John F. Maddrey, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defenders Beth S. Posner and Constance E. Widenhouse, for the defendant-appellant.*

STATE v. GOLDEN

[143 N.C. App. 426 (2001)]

EAGLES, Chief Judge.

Defendant Eddie Golden, Jr. was indicted, tried capitally and convicted of common law robbery and first-degree murder under the felony murder rule. Because the defendant was convicted of first-degree murder based on the felony murder rule, the trial court arrested judgment as to the common law robbery conviction. Defendant was sentenced to life in prison.

The evidence tended to show the following. The victim, James Golden, was defendant's uncle. Defendant's extended family, including the victim, lived near to each other in Pleasant Garden, N.C. Defendant's father was a heavy drinker and at a early age, defendant went to live with his grandmother. All of defendant's siblings have a history of abuse of either alcohol or drugs. Many of defendant's relatives have a history of alcohol problems. Defendant testified that he abuses alcohol and drugs, although he testified he has never gone to work drunk. Defendant dropped out of school after the eighth grade and has an IQ of 71 which is in the low range of borderline intelligence.

Prior to 29 April 1997, defendant had temporarily separated from his wife. He resided for a period of time with Joyce McSwain. On the morning of 29 April 1997, defendant awoke between 7:30 a.m. and 8:00 a.m. at Ms. McSwain's house. Defendant got dressed and got a beer. Ms. McSwain told defendant that she had company coming over and he would have to leave. While driving away from Ms. McSwain's home, defendant saw a man he had purchased crack cocaine from in the past. Defendant asked the man if he would "[l]et me get two twenties 'till Friday." Defendant testified that this meant that the man would give defendant two twenty dollar rocks of crack cocaine on credit until Friday. The man agreed and defendant drove on to the house of his cousin, James T. Golden, also known as "Nunnie." Defendant unlocked the door, entered the house and turned on the TV. Defendant called into work and was told that it was too wet for him to work that day. Defendant then searched Nunnie's refrigerator for beer. Hidden beside the refrigerator, defendant found ½ a fifth of gin and two 16 ounce cans of Budweiser beer. Defendant put one beer in the refrigerator and then returned to the TV room. He began to drink the gin and "chase" it with the other beer. Defendant had had three "drinks" when Nunnie and Herman Benton, another relative, entered the house. The three began talking about some needed repairs on Nunnie's truck and then walked outside to look at the truck. While outside, Mary Whitsett asked Herman Benton to go to

the store. Defendant asked Herman to bring back some Natural Light beer. Defendant went back into Nunnie's house twice for more "drinks" of gin. Defendant then spoke to and startled a man bringing Nunnie some materials. Next defendant went over to Mary Whitsett's house and asked another relative, Bonita if he could borrow $5. She refused and defendant said "[w]ell, that's all right. Well, I know where I can get it," turned around and walked out.

Defendant went back over to Nunnie's house and continued drinking. Defendant was not sure if Nunnie noticed that defendant was drinking his liquor. Defendant finished the beer he had earlier placed in the refrigerator. By that time, Herman Benton had returned from the store and defendant began drinking a beer that Mr. Benton had brought. A few minutes later, Nunnie left to do some business errands. After defendant heard Nunnie leave, he retrieved the crack cocaine and smoked one of the rocks he had acquired that morning. Defendant then called his sister about some problems she was having with her car. He told her to bring the car to him and he would take a look at it. He put down the phone and finished the fifth of gin.

About that time, defendant's sister arrived with her daughter and her daughter's boyfriend. Defendant and the boyfriend took the car out about a quarter of a mile to try and determine what its problems were. Defendant testified that he told his sister she needed a new modulator valve. He further testified that even if he was "passed out" he could tell if a car was "skipping." His sister then took him to the store and he purchased a 40 ounce Natural Light beer. Defendant called Ms. McSwain to find out if he could return to her house. She stated that she had not planned on him returning to her house, so defendant went back to his truck and smoked the other rock of crack cocaine.

Defendant then decided he needed some more money to buy more crack. Defendant walked over to victim's house because he saw the door open. Defendant asked if "he could borrow $20.00." Victim said he did not have any money. Defendant asked again and victim stated he did not have any money. Defendant asked again and at this point victim told defendant that if defendant did not leave, victim was going to shoot defendant. According to testimony of many of defendant's and victim's relatives, victim was reputed to keep guns in his house. Defendant then testified that the victim began to head toward victim's bed and defendant reached out and grabbed him. Defendant testified that he does not "really remember what happened" but that defendant held the victim on the bed until the victim quit moving.

STATE v. GOLDEN

[143 N.C. App. 426 (2001)]

Defendant then let go, took victim's wallet out of his pocket and about $30.00 in change from the desk drawer. The officers who secured the scene found no guns in the house, but found the victim's wallet in the wood stove. A second wallet was found in the crawl space of the victim's house. The defendant does not remember placing a wallet in either location.

Defendant then got into his truck and after refusing his cousin Mary Whitsett's request to check on his uncle, defendant drove towards Randleman. He went to Ms. McSwain's house and the two arranged to purchase a $20 rock of crack cocaine. They smoked the rock and then drank a beer. Later that evening, he turned his pager on and noticed that his nephew "Heavy" had called him. He drove to Heavy's house and was told that someone had killed his uncle. Defendant cried and then Heavy and his wife drove defendant home. The next day, defendant was contacted by Detectives Byrd and McBride of the Guilford County Sheriff's Department. Defendant did not confess at that time. On 2 May 1997 defendant spoke again with Detective McBride. Defendant admitted nothing. Defendant was questioned again in August of 1997 and admitted nothing. Defendant was arrested in October of 1997 for failing to appear for driving without a license in Randolph County. Defendant was questioned by Detectives McBride and Byrd about his uncle's death and at that time admitted his involvement. The officers wrote down what the defendant said, read it back to him and the defendant signed the written statement. Each time the defendant agreed to speak with the police, he voluntarily did so without his lawyer present.

During the charge conference defendant requested instructions on voluntary intoxication for the premeditated and deliberated portion of the first-degree murder charge. Defendant also requested a voluntary intoxication instruction for the felony murder portion of the charge. The trial court instructed on voluntary intoxication in the premeditation and deliberation portion but refused to give the instruction with the felony murder portion. The trial court held that as a matter of law the defendant had the specific intent to rob the victim when the defendant took the money. The defendant also requested a second-degree murder instruction based on the diminished capacity of defendant. The trial court refused. Because we believe that the defendant produced enough evidence of his intoxication for a reasonable juror to find that defendant did not have the capacity to form the specific intent to rob the victim, we hold that the trial court should have instructed the jury on voluntary intoxication.

Because we believe that on this record the defendant produced sufficient evidence for a reasonable juror to find that the defendant did not have the capacity to commit first-degree murder, we hold that the trial court should have instructed on the lesser included offense of second-degree murder. Accordingly we hold that defendant is entitled to a new trial.

## I. Voluntary Intoxication

[1] Defendant argues that the voluntary intoxication instruction should have been given as a possible defense to the robbery charges. The common law robbery conviction was used as the underlying felony for the felony murder charge. The voluntary intoxication instruction was given as a possible defense to the premeditation and deliberation charge but not as a possible defense to the robbery charge.

Robbery with a dangerous weapon is a specific intent crime. Voluntary intoxication in and of itself is not a legal defense. *State v. Gerald*, 304 N.C. 511, 521, 284 S.E.2d 312, 318 (1981). It is only a viable defense if the degree of intoxication is such that a defendant could not form the specific intent required for the underlying offense. *Id.* Our Supreme Court, in the context of first-degree murder, explained the proper usage of a voluntary intoxication instruction.

It is "well established that an instruction on voluntary intoxication is not required in every case in which a defendant claims that he killed a person after consuming intoxicating beverages or controlled substances." State v. Baldwin, 330 N.C. 446, 462, 412 S.E.2d 31, 41 (1992). Evidence of mere intoxication is not enough to meet defendant's burden of production. State v. Mash, 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988). Before the trial court will be required to instruct on voluntary intoxication, defendant must produce substantial evidence which would support a conclusion by the trial court that at the time of the crime for which he is being tried "defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. In absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon." State v. Strickland, 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987) (quoting State v. Medley, 295 N.C. 75, 79, 243 S.E.2d 374, 377 (1978)).

*State v. Cheek*, 351 N.C. 48, 74-75, 520 S.E.2d 545, 560 (1999). In *Cheek* the defendant testified that on the morning of the murder, defendant took a "hit of acid." *Id.* at 75, 520 S.E.2d at 561. Defendant next testified that when his friend "freaked out" it "killed [his] buzz." *Id.* The testimony further showed that defendant was able to drive a stolen cab for 51 miles, and was able to discuss, in detail, the events both before and after the murder. *Id.* Here, defendant consumed ½ a fifth of gin, several beers and 2 rocks of crack cocaine in four hours. Further, defendant cannot remember the details of the actual killing or what he did afterwards.

In addition defendant's expert, qualified in the fields of addiction medicine and addiction psychiatry, testified as to the psychological effects of the overuse of alcohol, both in the short and long terms. According to Dr. Roy Jacob Mathew's testimony, the long term effect of alcohol abuse can manifest itself in several ways, ranging from memory loss to dementia. Dr. Mathew testified further that the "disinhibiting effects" of cocaine and alcohol together are "something similar to releasing the breaks in the car and stepping on the gas pedal. Alcohol takes the inhibition off and the cocaine stimulates directly the primitive impulses." Dr. Mathew further testified that defendant has an I.Q. of 71 which is one point above retarded. This is relevant because "[l]ow I.Q. basically means malfunction of the neurons. It is the same neurons that inhibit the animal deeper down. So, people who have low I.Q. are usually more prone to the disinhibiting effects of alcohol and Valium, that group of drugs, and, in that sense, I thought the I.Q. of 71 was relevant." When asked if the defendant, under the conditions present that day, would have been able to form a specific intent to kill or a specific intent to rob, Dr. Mathew testified as follows:

DR. MATHEW: At the time of the commission of the crime, he was intoxicated, and he had basically lost control, all inhibitory control, and in that frame of mind, he would be unable to weigh the consequences of his actions.

QUESTION: And, finally, would these conditions you described taken together have impaired the defendant's ability to form a specific intent to kill or a specific intent to rob?

DR. MATHEW: Again, at the time of commission of the crime, it would have interfered with his ability. It would be like a horse with blinders on. It would be unfocused pure fury. It would have interfered.

In *State v. Lancaster*, 137 N.C. App. 37, 44, 527 S.E.2d. 61, 67 (2000), the defendant argued that the "evidence of defendant's history of drug addiction, as testified to by his drug counselors and employer, along with evidence of defendant's mental condition on the night of the robbery, constituted sufficient evidence such that a jury instruction on diminished capacity was warranted." *Id.* On the *Lancaster* facts, the Court held that the testimony was not sufficient to warrant the instruction. In *Lancaster*, the expert was not able to testify as to the capacity of the defendant.

> Mr. Bancroft was certified as an expert in the fields of substance abuse addictions and cognizant behaviors. He testified that defendant could have been impaired at the time of the robbery, but that "the euphoric high would have probably been over." Additionally, Bancroft testified that such an impairment "could have had a negative impact" upon the defendant's ability to form a plan or course of conduct. In a *voir dire* examination of Bancroft, he stated that he could not testify about the defendant's ability to think, make judgments, and distinguish right from wrong at the time these acts occurred. Bancroft's testimony only referred to the effect cocaine *could* have had on the defendant, based on his experience of how cocaine affects people in general.

*Id.* at 44-45, 527 S.E.2d at 67. Here, Dr. Mathew testified directly that defendant's intoxication would impair defendant's ability to form the specific intent to kill or rob.

The State argues that when the defendant was cross-examined by the district attorney, defendant testified that he intended to keep the money when he took it, to wit:

Question: You remember stealing all of that money from him, don't you?

Answer: Yes, I do.

Question: And you knew when you got that money that you weren't entitled to that money?

Answer: Yes; I reckon I did.

Question: And you knew it was wrong to take that money?

Answer: I reckon I did.

Question: And you knew that when you left out of that house with that money that you weren't going to give it back to him, that you were taking it for yourself?

Answer: I reckon so.

The State argues that from this testimony, no reasonable juror could find that the defendant did not have the intent to permanently deprive the victim of his property. We disagree. The defense presented substantial evidence that defendant was intoxicated from consuming a number of beers, a ½ of a fifth of gin and two rocks of crack cocaine in roughly four hours, having eaten nothing. Dr. Mathew testified that this amount of alcohol, combined with his past alcohol abuse, drug use and low I.Q. would impair defendant's ability to form the specific intent to rob. In *State v. Robertson*, 138 N.C. App. 506, 531 S.E.2d 490 (2000), this Court held that "whether defendant was so intoxicated as to prevent his forming the specific intent to rob and assault [the victim] was a question of fact, to be determined by the jury." *Id.* at 508, 531 S.E.2d at 492; *State v. Caldwell*, 616 So.2d 713, 721 (La.Ct.App. 1993); *Bryant v. State*, 574 A.2d 29, 35 (Md.Ct.App. 1990); *State v. Givens*, 631 S.W.2d 720, 721 (Tenn.Crim.App. 1982).

In *State v. Kyle*, 333 N.C. 687, 699, 430 S.E.2d 412, 418 (1993), the defendant requested that the trial court instruct on the defense of voluntary intoxication. *Id.* Our Supreme Court concluded that it was error for the trial court to limit the voluntary intoxication instruction only to the murder charge. *Id.* Defendant was entitled, upon his request, to have the trial court instruct the jury on the law regarding voluntary intoxication as it applied to the offenses of burglary and kidnaping as well as premeditated and deliberated murder. *Id.* However, in *Kyle*, the error was harmless because the jury returned a verdict of first-degree murder on the basis of premeditation and deliberation and the felony murder rule. *Id.* "By finding defendant guilty of first-degree, premeditated and deliberated murder, the jury failed to find that defendant was intoxicated to a degree sufficient to negate his ability to form the specific intent to kill, thus rejecting defendant's voluntary intoxication defense." *Id.* at 699, 430 S.E.2d at 418-19. "The jury's first-degree murder conviction based on premeditation and deliberation indicates that it considered defendant capable of forming specific intent." *Id.* Here, unlike *Kyle*, the jury found the defendant not guilty of premeditated and deliberated murder. The same jury, without a voluntary intoxication instruction as to robbery, determined that the defendant was capable of the specific intent to

rob. There is no indication that the jury rejected the voluntary intoxication defense. Therefore, this error is prejudicial. This Court has held that if a "request be made for a special instruction, which is correct in itself and supported by evidence, the court must give the instruction at least in substance." *State v. Lamb*, 321 N.C. 633, 644, 365 S.E.2d 600, 605-06 (1988); State v. Hooker, 243 N.C. 429, 431, 90 S.E.2d 690, 691 (1956).

## II. Second-Degree Murder

[2] Defendant next assigns error to the trial court's refusal to instruct the jury on second-degree murder. Defendant asserts that there was conflicting evidence as to the defendant's ability to form the specific intent to premeditate and deliberate the murder. On this record, we agree.

Jury instructions of a lesser included offense are required "if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and acquit him of the greater." *State v. Gary*, 348 N.C. 510, 524, 501 S.E.2d 57, 67 (1998). The test is whether there "is the presence, or absence, of any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous offense." *State v. Wright*, 304 N.C. 349, 351, 283 S.E.2d 502, 503 (1981). In *State v. Brooks*, 136 N.C. App. 124, 523 S.E.2d 704 (1999), this Court held that in a trial for first-degree murder where there was evidence warranting an instruction on voluntary intoxication, an instruction of second-degree murder is proper. *Brooks*, 136 N.C. App. at 131, 523 S.E.2d at 709. On this record, the trial court gave the voluntary intoxication instruction in conjunction with the premeditated and deliberated portion of the first-degree murder instruction. If the defendant presented sufficient evidence showing that "defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill," an instruction on second-degree murder is proper. *Cheek*, 351 N.C. at 74-75, 520 S.E.2d at 561.

On this record, however, the error is harmless. Defendant was acquitted of premeditated and deliberated murder. Murder in the first-degree is the unlawful killing of a human being with malice and with premeditation and deliberation. G.S. 14-17; *State v. Lamm*, 232 N.C. 402, 61 S.E.2d 188 (1950). Murder in the second-degree is the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Foust*, 258 N.C. 453, 128 S.E.2d 889 (1963). Malice is not an element of felony murder. Therefore, second-

degree murder cannot be a lesser included offense of first-degree murder based on felony murder alone. *State v. Weaver*, 306 N.C. 629, 635, 295 S.E.2d 375, 379 (1982), *overruled on other grounds, State v. Collins*, 334 N.C. 54, 431 S.E.2d 188 (1993). There is no offense of felony murder in the second-degree in this jurisdiction. *State v. Davis*, 305 N.C. 400, 422, 290 S.E.2d 574, 590 (1982). Thus, when the defendant was acquitted of premeditated and deliberated murder, but convicted of felony murder, the jurors, following their instructions, found that all the elements of felony murder were present. The jurors determined that no malice or degree of malice was necessary to find the defendant guilty of felony murder. Thus, on this record, that the jury was not instructed as to second-degree murder is harmless error.

Because this case is remanded to the trial court for a new trial, we need not address the remaining issues. Accordingly, the judgment of the trial court is vacated and the case is remanded for a

New trial.

Judges HUNTER and CAMPBELL concur.