IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-314

Filed 19 December 2023

Cumberland County, No. 21 CRS 51709

STATE OF NORTH CAROLINA

      v.

LEO GEORGE RUBENSTAHL, Defendant.

Appeal by defendant from judgment entered 23 September 2022 by Judge James F. Ammons, Jr., in Cumberland County Superior Court. Heard in the Court of Appeals 18 October 2023.

> *Attorney General Joshua H. Stein, by Assistant General Counsel South A. Moore, for the State.*
>
> *The Sweet Law Firm, PLLC, by Kaelyn N. Sweet, for defendant-appellant.*

DILLON, Judge.

Defendant Leo George Rubenstahl appeals from judgment entered upon a jury's verdict convicting him of first-degree murder for causing the death of his wife. Our review shows no error.

## I.    Background

At approximately 2 a.m. on 25 February 2021, Defendant's wife Enelrae Rubenstahl was found dead in the home she shared with Defendant in Linden. Evidence at trial tended to show as follows:

Leading up to her death, Enelrae expressed fears to friends and family that Defendant was going to shoot her. In particular, she was uncomfortable that Defendant kept his handgun on his nightstand while they slept; her friend testified that Enelrae said, "I sleep scared." A co-worker even offered to intervene to protect her from Defendant. Three weeks before her murder, Enelrae met with her church's pastor and deacon. They noticed bruises on both sides of her neck consistent with strangulation, and she admitted that Defendant had "been holding her head down[.]"

On 24 February 2021, the day before her death, Enelrae spent the afternoon and evening with Defendant, his daughter Christina, and her children. At approximately 1 a.m. the next morning, Defendant called Christina to confess that he had killed Enelrae. Christina testified,

> All he kept saying over and over again was I messed up. I messed up. I did something that I can't come back from. I just wanted you to know that I love you and I love the kids. . . . And he said, I shot [Enelrae]. . . . while we were on the phone, he said that he had no regrets about it and that he had shot her and then realized she was still breathing and kept shooting her. . . . it eventually got to the point of him talking about taking his own life because he didn't want to deal with the consequences of what he had done.

When Christina arrived at the house, she asked Defendant about the location of his handgun. He initially lied to her—saying he "threw it in the pond"—before admitting that he hid it within a pile of towels in the bathroom. Before the police arrived, Christina heard Defendant call his sister and "explain[ ] to her on voicemail . . . what he had done."

When law enforcement arrived at the scene, they found Enelrae deceased in the bedroom hallway. She was unclothed except for her undergarments, which were on inside out. They also found Defendant's handgun hidden within the towels. They promptly arrested Defendant, and he was subsequently indicted.

At trial, the medical examiner testified that Enelrae was shot ten times on her chest, arms, and face (including both eyes) at a close range, injuries which "would take probably several minutes for her to die[,]" rather than cause an instantaneous death. Enelrae also had a large bruise covering the right side of her neck and face and her right ear, likely caused by blunt force trauma prior to her death. The medical examiner did not observe any defensive wounds.

The firearms forensic examiner testified regarding Defendant's handgun found at the scene: a 45 Colt single-action revolver. This type of revolver requires the user to first cock the hammer and then pull the trigger each time the gun is fired—in other words, pulling the trigger does automatically cock the hammer, as it would in a double-action revolver. The cylinder holds only six cartridges when fully loaded. To load it, one must rotate the cylinder and load each cartridge (containing a bullet) individually. After firing the six cartridges, one must repeat the process of rotating the cylinder to unload each one individually before reloading the gun. In sum, this is a cumbersome process.

At trial, Defendant took the stand and testified that Enelrae's niece had shot and killed Enelrae.

Defendant was convicted of first-degree murder and sentenced to life imprisonment without parole. Defendant timely appealed.

## II. Analysis

Defendant argues the trial court erred when it did not instruct the jury on (1) the affirmative defense of voluntary intoxication and (2) the lesser-included offense of second-degree murder. We disagree.

### A. Voluntary Intoxication Jury Instruction

On appeal—for the first time—Defendant asserts the defense of voluntary intoxication. Defendant did not request a jury instruction on voluntary intoxication at trial. Thus, we review this argument for plain error. *State v. Collington*, 375 N.C. 401, 410, 847 S.E.2d 691, 698 (2020) ("[U]npreserved issues related to jury instructions are reviewed under a plain error standard, while preserved issues are reviewed under a harmless error standard."). *See also State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) ("To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty.").

During the charge conference, the trial court explicitly asked if Defendant wanted to include voluntary or involuntary intoxication instructions, to which his counsel declined. Thus, this challenge was not preserved. Assuming the trial court otherwise erred by not giving the intoxication instruction, for the reasoning below, we conclude that the trial court did not plainly err.

To warrant a jury instruction on voluntary intoxication,

> [t]he evidence must show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. In the absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon.

*State v. Strickland*, 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987) (citations omitted). Our Supreme Court warns our courts to apply "great caution" in allowing a voluntary intoxication instruction. *State v. Meader*, 377 N.C. 157, 162, 856 S.E.2d 533, 537 (2021) (quoting *State v. Murphy*, 157 N.C. 614, 617-18, 72 S.E. 1075, 1076-77 (1911)). "[A]n instruction on voluntary intoxication is not required in every case in which a defendant claims that he killed a person after consuming intoxicating beverages[.]" *State v. Baldwin*, 330 N.C. 446, 462, 412 S.E.2d 31, 41 (1992). In making this determination, the evidence must be viewed in the light most favorable to the defendant. *Meader*, 377 N.C. at 162, 856 S.E.2d at 537.

Courts consider a variety of factors when determining whether a defendant should receive a voluntary intoxication jury instruction. One important factor is the amount of alcohol consumed. *See State v. Golden*, 143 N.C. App. 426, 431-33, 546 S.E.2d 163, 167-68 (2001). Further, the defendant's alcohol tolerance affects the determination—particularly if the defendant is an alcoholic with a presumably higher tolerance. *See State v. Walls*, 342 N.C. 1, 46, 463 S.E.2d 738, 761-62 (1995). Another factor is the defendant's memory of the killing and the time leading up to

and following the killing, with a detailed memory weighing against a voluntary intoxication instruction. *See State v. Herring*, 338 N.C. 271, 276, 449 S.E.2d 183, 186 (1994); *Golden*, 143 N.C. App. at 431, 546 S.E.2d at 167.

In this case, Defendant was a heavy drinker and had been for years, suggesting a higher tolerance for alcohol that the average person. He was unsure how many beers he consumed, speculating the number could be approximately ten or eleven from the afternoon of 24 February 2021 through the midnight hours of 25 February 2021 (a nearly twelve-hour period). Further, Defendant testified that he was "slowly drinking" throughout the day and it was a "normal" day for himself.

In his own testimony, Defendant said he "got drunk" *after* the killing because his wife was dead, indicating he was not already drunk during the killing. Additionally, Defendant's memory of that day and night are clear. He was able to describe the people he saw and what they were wearing, his activities that evening, and a detailed timeline (including his mental processes) leading up to the killing, the killing itself, and the time and events afterwards. He was also cognizant enough to hide the revolver and call Christina to confess his actions before Christina and law enforcement arrived at the scene.

Though Defendant may have been intoxicated from drinking a number of beers throughout the course of the afternoon, evening, and night, the evidence does not show that he was "so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." *Strickland*, 321

N.C. at 41, 361 S.E.2d at 888. Thus, we conclude Defendant has failed to show plain error by the trial court not instructing the jury on the affirmative defense of voluntary intoxication.

### B. Second-Degree Murder Jury Instruction

Defendant argues the jury could have reasonably found that Defendant committed only second-degree murder because he lacked the requisite deliberation and premeditation elements for first-degree murder. In his brief, Defendant characterizes himself as "a volatile alcoholic who fired his gun at anything that frustrated him" and claims he could have shot his wife during an "explosive marital argument" during which he lacked a "cool state of mind."

A request for jury instructions on a lesser-included offense during the charge conference is sufficient to preserve the issue for appellate review. *See State v. Collins*, 334 N.C. 54, 61-62, 431 S.E.2d 188, 193 (1993).

Here, defense counsel requested a jury instruction on second-degree murder during the charge conference, but the trial court denied this request. Even though counsel did not repeat his objections after the charge was given, he nevertheless preserved this issue for review.

In 1979, our Supreme Court stated that a second-degree murder instruction *must* be given where the State seeks a conviction for first-degree murder based on premeditation and deliberation, so as to leave it up to the jury to decide whether the defendant premeditated/deliberated to kill rather than merely to assault:

> Assuming *arguendo* that there was no positive evidence of the absence of premeditation and deliberation, the trial court was still required to submit the issue of second degree murder to the jury. In the instant case the [S]tate relied upon premeditation and deliberation to support a conviction of murder in the first degree. In *State v. Harris*, 290 N.C. 718, 730, 228 S.E.2d 424, 432 (1976), we held that, "in all cases in which the State relies upon premeditation and deliberation to support a conviction of murder in the first degree, the trial court must submit to the jury an issue of murder in the second degree." This requirement is present because premeditation and deliberation are operations of the mind which must always be proved, if at all, by circumstantial evidence. If the jury chooses not to infer the presence of premeditation and deliberation, it should be given the alternative of finding the defendant guilty of second degree murder. *State v. Keller*, 297 N.C. 674, 256 S.E.2d 710 (1979).

*State v. Poole*, 298 N.C. 254, 258, 258 S.E.2d 339, 342 (1979).

However, four years later, our Supreme Court stated that a second-degree murder instruction is not required "in *every case* in which the State relies on premeditation and deliberation to support a conviction of first-degree murder." *State v. Strickland*, 307 N.C. 274, 281, 298 S.E.2d 645, 651 (1983) (emphasis in original). And where the State has put forth evidence which establishes premeditation and deliberation of the intent to kill "and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial court should properly exclude from jury consideration the possibility of a conviction of second-degree murder." *Id.* at 293, 298 S.E.2d at 658.

The Court has since stated that "a defendant is not entitled to an instruction

on [second-degree murder] merely because the jury could possibly believe some of the State's evidence [supporting first-degree murder] but not all of it." *State v. Leazer*, 353 N.C. 234, 240, 539 S.E.2d 922, 926 (2000) (cleaned up).

However, where the State's evidence, if believed, is capable of conflicting reasonable inferences either that (1) the defendant premeditated/deliberated a specific intent to kill or, alternatively, (2) the defendant merely premeditated/deliberated an assault, the defendant is entitled to both first-degree and second-degree murder instructions.[1] *See, e.g., State v. Jerrett*, 309 N.C. 239, 263, 307 S.E.2d 339, 352 (1983) (stating that it is "for the jury to resolve the conflicting inferences arising from the evidence"); *State v. Benton*, 299 N.C. 16, 24, 260 S.E.2d 917, 922 (1980) (concluding that testimony permitting conflicting inferences is for the jury to resolve).

Here, though, we conclude that the evidence only leads to one inference regarding premeditation and deliberation: Defendant specifically intended to kill his wife. The evidence indicates that Defendant shot Enelrae many times with a firearm that required a great deal of effort to operate, manually cocking the gun and pulling the trigger for each shot. And to shoot Enelrae ten times with the Colt 45 single-

---

[1] Where the evidence is capable of conflicting inferences on premeditation and deliberation, and if the defendant fails to request that a second-degree murder instruction be given and he is subsequently convicted for first-degree murder, he would only be entitled to plain error review of the trial court's failure to instruct on second-degree murder where he would have to show that the jury "probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

action revolver, Defendant must have unloaded and reloaded the revolver during the killing (since the cylinder only held six bullets at a time).

Defendant also made threats to Enelrae prior to her killing. For example, Defendant allegedly once shot holes into his above-ground pool; while recounting what happened, he looked into Enelrae's eyes and said, "I should have shot you." Further, Enelrae did not have defensive wounds, suggesting Defendant continued to shoot her after she was rendered helpless. Finally, there was evidence of prior physical and domestic abuse, such as the bruises on Enelrae's neck three weeks before her murder that suggested strangulation.

## III.    Conclusion

In sum, we conclude Defendant received a fair trial, free of reversible error.

NO ERROR.

Judges TYSON and GRIFFIN concur.